**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| RAMON LOPEZ | : | PRISONER<br>CIVIL NO. 3:02CV1020 (RNC)(DFM) |
| v. | : | |
| JAMES SMILEY, ET AL. | : | DECEMBER *15* , 2003 |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION TO CONVERSE WITH LEGAL COUNSEL**
**WHO IS A FELLOW PRISONER DATED NOVEMBER 16, 2003**

By pleading dated November 16, 2003, plaintiff pro se prisoner asks this Court to order

that he be allowed to work with a fellow prisoner, Duane Ziemba, on this case. We urge the

Court to deny the request.

Directives of the Department of Correction generally prohibit inmates from

communicating with each other, unless they are related, to further the substantial interests of

security, order and rehabilitation. DOC Directive 10.7 (4)(C), Exhibit A. This prohibition

includes consulting with each other on litigation. Shuckra v. Armstrong, 1999 Conn. Super.

LEXIS 705 (Conn. Super. Ct. March 4, 1999), Exhibit B. Restrictions on inmate

communications are valid if they are reasonably related to legitimate penological interests and

goals. Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). That the

communication concerns legal advice from a "jailhouse lawyer" makes no difference. Shaw v.

Murphy, 532 U.S. 223, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001). In upholding this restriction

in a similar case, it was held:

> The regulation at issue meets the test set out in *Turner v. Safley, 482 U.S. 78, 96*
> *L. Ed. 2d 64, 107 S. Ct. 2254 (1987),* because it is reasonably related to legitimate

penological interests and goals.    Warden David Marcial's testimony clearly established that prohibiting direct inmate to inmate communication is required for inmate safety and institutional security given the potential for gang members, and others, to send coded messages through what purports to be legal correspondence, and to use third parties to convey information, including information relating to criminal enterprises.    These were the same sorts of concerns cited by Justice O'Connor at pages 91-92 of Turner v. Safley.    A very real potential also exists, Warden Marcial testified, for more sophisticated inmates to manipulate, or gain control over the affairs of other less sophisticated inmates.    See also the testimony of prison officials in Turner v. Safley that "mail between institutions can be used to communicate escape plans and to arrange assault and other violent acts." *Turner v. Safley, 482 U.S. at 91.*    Courts should be extremely reluctant to interfere with the day to day judgments of corrections officials on matters relating to security in the absence of a substantial, demonstrated need. *Turner v. Safley, 482 U.S. at 78; Lewis v. Casey, 516 U.S. 804, 133 L. Ed. 2d 13, 116 S. Ct. 47 (1996).* Also see *Washington v. Meachum, 238 Conn. 692, 680 A.2d 262 (1995).*

Shuckra v. Armstrong, supra at p. 5.

The same general concerns are applicable in the instant case, and we urge the Court to rule likewise.

This general bar does not interfere with plaintiff's access to the Court to pursue his civil litigation.    In Connecticut, there is an Inmate Legal Assistance Program (LAP) which provides civil legal assistance to inmates in all DOC facilities.    A copy of the State's contract with LAP is attached in Exhibit C.    This service facially satisfies plaintiff's constitutional rights.    See Smith v. Armstrong, 968 F. Supp. 40 (D. Conn. 1996), citing Lewis v. Casey, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996).    The LAP is ready and able to help plaintiff.    In fact, the letter from LAP to plaintiff supplied by plaintiff in his Motion indicates their willingness to help.    "In the future, if you require legal assistance in any other civil matters, please write to this office at the address listed below." See Letter, Exhibit D.

Plaintiff complains that he asked LAP to send legal materials to other inmates and LAP refused.    Plaintiff's Brief, p. 2, Exhibit B.    Plaintiff cites to a case where a judge, who ultimately

denied a "Motion to Converse with Legal Counsel who is a Fellow Prisoner," referred a pro se plaintiff to LAP, which the Court indicated can "funnel" information to other inmates under an unexplained "procedure."   Plaintiff's Brief, p. 2 citing <u>Barletta v. Myers</u>, 6 Conn. Ops. 1332 (Memorandum, October 27, 2000).   The DOC does have a procedure where LAP can assist inmates who need to correspond with other inmates, but that help is contingent on a Court order allowing the communication.   DOC Directive 10.3 (11), Exhibit E.   No such order has been entered in this case, and, considering the lack of demonstrated, lawful need in this case, and the security risks, we urge the Court to deny the request.

### CONCLUSION

For all of the foregoing reasons, we urge the Court to deny plaintiff's motion.

DEFENDANTS
James Smiley, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Robert F. Vacchelli
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct05222
E-Mail:  robert.vacchelli@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following on this 15th day of December 2003:

      Ramon Lopez #261685
      Northern Correctional Institution
      P.O. Box 665
      Somers, CT  06071

                        Robert F. Vacchelli
                        Assistant Attorney General

# ATTACHMENT A

A.D. 10.7, Inmate Communication - effective 7/17/95

1.  <u>Policy</u>.  The Department of Correction may allow inmate correspondence by mail and by telephone.  Correspondence may be reviewed, read, listened to, recorded, restricted, or prohibited in accordance with the provisions of this Directive.

2.  <u>Authority and Reference</u>.

    A.  Connecticut General Statutes, Sections 4-8, 18-81, 52-570d, 54-82c and 54-186.
    B.  Regulations of Connecticut State Agencies, Sections 18-81-28 through 18-81-51.
    C.  American Correctional Association, Standards for Community Residential Facilities, Second Edition, August 1980, Standard 2-2101.
    D.  American Correctional Association, Standards for Adult Correctional Institutions, Third Edition, January 1990, Standards 3-4259, 3-4260, 3-4262 and 3-4429 through 3-4439.
    E.  American Correctional Association, Standards for Adult Local Detention Facilities, Third Edition, March 1991, Standards 3-ALDF-3D-21 through 3-ALDF-3D-23, and 3-ALDF-5D-01 through 3-ALDF-5D-09.
    F.  Administrative Directives 3.6, Inmate Accounts; 6.10, Inmate Property; 6.14, Security Risk Groups; 9.4, Restrictive Status and Level 5 Units; and 9.5, Code of Penal Discipline.

3.  <u>Definitions</u>.  For the purposes stated herein, the following definitions apply:

    A.  <u>"Collect Call Only" Telephones</u>.  Telephones which allow for outgoing calls on a collect call basis only and which are available in areas specified by the Unit Administrator for inmate use.
    B.  <u>Contraband</u>.  Anything not authorized to be in an inmate's possession or anything used in an unauthorized or prohibited manner.
    C.  <u>General Correspondence</u>.  All correspondence not defined as privileged communication in Section 3(E).
    D.  <u>Inspection</u>.  A physical and visual examination of the actual contents, which shall not include the reading of the correspondence.
    E.  <u>Privileged Correspondence</u>.  Any telephone call placed on behalf of an inmate by the facility or any written correspondence shall be considered "privileged communication" when addressed to or received from federal, state and local (e.g., municipal, county or town) elected and appointed officials, including but not limited to the following: (1) any judge or court; (2) the Governor; (3) the legislature; (4) the Attorney General; (5) the Commissioner of Correction or any Department official appointed by the Commissioner; (6) the Board of Parole; (7) the Sentence Review Board; (8) the Commission on Human Rights and Opportunities; (9) the State Claims Commissioner; (10) the Board of Pardons; and (11) elected government officials.

        "Privileged communication" shall also mean any telephone call placed on behalf of an inmate by the facility or any written

correspondence addressed to or received from the Connecticut Correctional Ombudsman or attorneys. The word "attorneys" shall include organizations providing legal services to inmates.

F.  <u>Publication</u>. A book (for example, novel, instructional manual), or a single issue of a magazine or newspaper, plus such other materials addressed to a specific inmate as advertising brochures, flyers and catalogues.

G.  <u>Recording and Listening</u>. The recording and listening, including electronic recording of the number(s) called, on-line listening, recording of inmate telephone conversations and subsequent listening to recordings of inmate telephone conversations.

H.  <u>Review</u>. A visual examination of an inmate's general correspondence, which may include, but shall not be limited to, reading the correspondence.

I.  <u>Unit</u>. An organizational component of the Department, subordinate to a division or subdivision, administered by a Unit Administrator. A unit may be a correctional facility, a community service unit, or other special service unit.

4.  <u>Inmate Correspondence</u>. Inmates may write and receive letters subject to the following provisions:

A.  <u>Frequency</u>. There shall be no limit placed on the number of letters an inmate may write or receive at personal expense, except as a disciplinary penalty in accordance with Administrative Directive 9.5, Code of Penal Discipline.

B.  <u>Timely Handling</u>. Incoming and outgoing correspondence shall be processed without unnecessary delay.

C.  <u>Correspondents</u>. An inmate may write to anyone except: (1) a victim of any criminal offense for which the inmate has served or is serving a sentence, or stands convicted of, or disposition is pending; (2) any person under the age of 18 when the person's parent or guardian objects in writing to such correspondence; (3) an inmate in another correctional facility, other than immediate family; (4) a parolee or inmate on community confinement without the express permission of the Unit Administrator and the addressee's supervisor; (5) any person whom the inmate is restrained from writing to by court order; or (6) any other person, when prohibiting such correspondence is generally necessary to further the substantial interests of security, order or rehabilitation.

D.  <u>Cost of Correspondence</u>. Each inmate shall pay personal mailing expenses, except an indigent inmate. An indigent inmate, as defined in Administrative Directive 6.10, Inmate Property, shall be permitted two (2) free social letters each week, and five (5) letters per month addressed to the court or attorneys, including any request for speedy trial under Sections 54-82c and 54-186 of the Connecticut General Statutes. Additional free correspondence to courts and attorneys may be authorized by the Unit Administrator based upon the reasonable needs of the inmate.

E.  <u>Outgoing General Correspondence</u>.

1.  <u>Review, Inspection and Rejection</u>. All outgoing general

correspondence shall be subject to being read at the
direction of the Unit Administrator, by person(s) designated
in writing by such Administrator, for either a specific
inmate(s) or on a random basis if the Commissioner or Unit
Administrator has reason to believe that such reading is
generally necessary to further the substantial interests of
security, order or rehabilitation.  Outgoing general
correspondence may be restricted, confiscated, returned to
the inmate, retained for further investigation, referred for
disciplinary proceedings or forwarded to law enforcement
officials, if such review discloses correspondence or
materials which contain or concern: (a) the transport of
contraband in or out of the facility; (b) plans to escape;
(c) plans for activities in violation of facility or
departmental rules; (d) plans for criminal activity; (e)
violations of or unit rules; (f) information which if
communicated would create a clear and present danger of
violence and physical harm to a human being; (g) letters or
materials written in code; (h) mail which attempts to
forward unauthorized correspondence for another inmate; or
(i) threats to the safety or security of staff, other
inmates or the public.

The initial decision to take any action provided for in Section 4(E)(1)
except to read, which shall be at the discretion of the Unit
Administrator, shall be made by the designee of the Unit Administrator.
Such designee shall not be the same person who made the initial mailroom
review.

2.   Notice of Rejection  In the event that the designee of the
     Unit Administrator determines that outgoing general
     correspondence shall not be sent as provided for above in
     Section 4(E)(1) the inmate sender shall be notified in
     writing of the correspondence rejection and the reason
     therefor. The inmate may seek review in writing within five
     (5) days thereafter from the Unit Administrator.  The Unit
     Administrator shall notify the inmate of the final decision
     and the reason therefor in writing.  In the event such
     rejection results in referral for prosecution or
     investigation for violation of unit or department rules or
     of the criminal law, the notice of rejection may be delayed
     until the appropriate investigation is completed.

3.   Limitations on Restrictions.  Any restrictions imposed on
     outgoing general correspondence shall be unrelated to the
     suppression of expression and may not be restricted solely
     based on unwelcome or unflattering opinions or factually
     inaccurate statements.

4.   Procedure for Mailing.  Outgoing general correspondence
     shall be inserted into the envelope and sealed by the inmate
     but shall be subject to inspection, review and rejection
     subject to the provisions of Section 4(E)(1) above.  All
     outgoing general correspondence shall include: (a) a
     complete legible name and address of the party the
     correspondence is being sent to; (b) the inmate's complete
     legible name, inmate number, and present unit address; and
     (c) the name under which the inmate was committed to the

facility or another name approved for official recognition. Correspondence which fails to include this information shall be returned, if reasonably practicable, to the inmate.

F.    Incoming General Correspondence.

1.    Review, Inspection and Rejection.  All incoming general correspondence shall be opened and inspected for contraband and money and shall be subject to being read at the direction of the Unit Administrator, by person(s) designated by such administrator, for either a specific inmate(s) or on a random basis when the Commissioner or Unit Administrator has reason to believe that such reading is reasonably related to legitimate penological interests.  All incoming general correspondence may be rejected if such review discloses correspondence or material(s) which would reasonably jeopardize legitimate penological interests, including, but not limited to, material(s) which contain or concern: (a) the transport of contraband in or out of the facility; (b) plans to escape; (c) plans for activities in violation of facility or department rules; (d)  plans for criminal activity; (e) violations of this Directive or unit rules; (f) material which reasonably could cause physical or emotional injury to the inmate recipient as determined by the appropriate mental health staff; (g) letters or materials written in code; (h) threats to the safety or security of staff, other inmates, or the public, facility order or discipline, or rehabilitation; (i) sexually explicit material(s) which meet the standards and review procedures set forth in Section 4(M)(1) below; or (j) any other general correspondence, rejection of which is reasonably related to a legitimate penological interest. Incoming general correspondence containing any of the foregoing may be restricted, confiscated, returned to the sender, retained for further investigation, referred for disciplinary proceedings or forwarded to law enforcement officials.  The decision to take any action provided for in this Section shall be made by the designee of the Unit Administrator.  Such designee shall not be the same person(s) who made the initial mailroom review.

2.    Notice of Rejection.  In the event the designee of the Unit Administrator determines that incoming general correspondence shall not be delivered as provided for above in Section 4(F)(1), the sender and the inmate shall be notified in writing of the correspondence rejection and the reason therefor.  The person(s) so notified may seek review in writing within 10 days thereafter from the Unit Administrator.  The Unit Administrator shall notify the person(s) seeking review of the Unit Administrator's final decision and the reason therefor in writing.  In the event such rejection results in referral for prosecution or investigation for violation of unit or department rules or of the criminal law, the notice of rejection may be delayed until the appropriate investigation is completed.  If the ultimate decision is to reject delivery and if there is no further need to retain the rejected correspondence, then it shall be returned to the sender if reasonably practicable.

G.    <u>Monetary Remittances</u>.

    1.    <u>Incoming</u>.  An inmate may only receive certified, payroll, cashier or government checks and money orders from sources approved by the Unit Administrator.  The amount and source shall be recorded.  Cash shall not be accepted through the mail for credit to an inmate's account.  A receipt shall be issued to the inmate for any acceptable funds approved.

    2.    <u>Outgoing</u>.  An inmate must obtain prior approval in order to send funds out of the facility in accordance with Administrative Directive 3.6, Inmate Accounts.

H.    <u>Identification of Privileged Correspondence</u>.  Only correspondence clearly identified as privileged correspondence shall be treated as privileged correspondence.  Correspondence not so identified shall be treated as general correspondence.  Such identification shall specify a correspondent as enumerated in Section 3(E).

I.    <u>Outgoing Privileged Correspondence</u>.  Outgoing privileged correspondence shall be inserted into an envelope clearly identifying a privileged correspondence addressee as enumerated in Section 3(E) and sealed by the inmate.  Outgoing privileged correspondence shall not be opened, nor read.  Each facility shall provide a special mailbox for unfranked privileged correspondence directed toward Department officials in accordance with Section 4(H) above.  All correspondence shall be forwarded without unnecessary delay.

J.    <u>Incoming Privileged Correspondence</u>.  All incoming privileged correspondence shall be opened and inspected, but not read, only in the presence of the inmate addressee.

    1.    <u>Inspection and Rejection</u>.  If upon opening and inspecting such privileged correspondence it contains nonwritten enclosure(s), then such enclosure(s) may be examined to determine whether the delivery of such enclosure(s) would reasonably jeopardize a legitimate penological interest.  If the Unit Administrator determines that delivery of the enclosure(s) would reasonably jeopardize a legitimate penological interest, then the Unit Administrator may refuse to deliver such correspondence and its enclosure(s).  The sender and the inmate shall be notified in writing of the privileged correspondence rejection and the reason therefore.  In no such case shall the Unit Administrator read the privileged correspondence or written enclosure(s).  If the enclosure(s) is not appropriate for criminal prosecution, further investigation for violation of unit or department rules, or of the criminal law, the unread correspondence and the enclosure(s) shall be returned to the sender with a statement of the reason therefor.  If the Unit Administrator reasonably believes that the enclosure(s) should be referred for criminal prosecution or investigation for violations of unit or department rules, or of the criminal law, the unread correspondence shall be sealed and

forwarded in a confidential manner with the enclosure(s) to the appropriate law enforcement or other agency for investigation, together with a written statement as to the reason therefor.

2. <u>Notice of Rejection</u>. In the event that the Unit Administrator determines that incoming privileged correspondence or enclosure(s) shall not be delivered the inmate and the sender shall be notified in writing of the rejection and the reason therefor. The person(s) so notified may seek review in writing within 10 days thereafter from the appropriate Deputy Commissioner or designee. The Deputy Commissioner or designee shall notify in writing the person(s) of the final decision and the reasons therefor. In the event such rejection results in referral for prosecution or investigation for violation(s) of unit or department rules, or of the criminal law, the notice of rejection may be delayed until the appropriate investigation is completed.

3. <u>Accidental Opening</u>. If privileged correspondence is opened accidentally, outside the presence of the inmate, the envelope shall be immediately stapled and the required inspection for unauthorized enclosure(s) accomplished in the presence of the inmate.

K. <u>Forwarding of Mail</u>. An inmate shall be responsible for informing a correspondent of a change of address. When an inmate is transferred to another facility privileged correspondence shall be forwarded to the inmate's new facility. The Department shall not be responsible for the forwarding of general correspondence. If an inmate has escaped or is released, the correspondence shall be marked "Escaped" or "Released" and returned to the sender.

L. <u>Certified Mail</u>. Requests for a speedy trial under Sections 54-82c and 54-186 of the Connecticut General Statutes and correspondence with the Sentence Review Board shall be the only correspondence routinely sent certified. Any other request for mailing by Certified Mail, for good cause, shall be authorized at the discretion of the Unit Administrator.

M. <u>Incoming Publications and Materials</u> . Requests for any local orders for books, magazines, newspapers, educational materials or periodicals shall be made through the school principal or other person as designated by the Unit Administrator who shall determine that the inmate is able to pay for such material(s). If approved, a check or money order for payment shall be withdrawn from the inmate's account and included with the order. An inmate may order hardcover books in new condition only from a publisher, book club, or book store. Incoming materials which adversely affect a valid penological interest may be rejected in accordance with the following review procedures:

1. <u>Procedures for Review of Publications and Sexually Explicit Materials</u>. The Unit Administrator may reject a publication only if it is determined to be detrimental to the security, good order, or discipline of the facility or if it might facilitate criminal activity. The Unit Administrator may not reject a publication solely because its content is

religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant.  Publications which may be rejected by a Unit Administrator include but are not limited to publications which meet one of the following criteria:  (a) it depicts or describes procedures for the construction or use of weapons, ammunition, bombs or incendiary devices; (b) it depicts, encourages, or describes methods of escape from correctional facilities, or contains blueprints, drawings or similar descriptions of the Department of Correction's facilities; (c) it depicts or describes procedures for the brewing of alcoholic beverages, or the manufacture of drugs; (d) it is written in code; (e) it depicts, describes or encourages activities which may lead to the use of physical violence or group disruption; (f) It encourages or instructs in the commission of criminal activity; or (g) it is sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the facility, or facilitates criminal activity.

A Unit Administrator shall determine that sexually explicit material of the following types is to be excluded: (1) sado-masochistic; (2) bestiality; (3) involving children; or (e) materials depicting sexual activity which involves use of force or without the consent of one or more parties.

2.   Individual Review of Publications or Materials.  The Unit Administrator may not establish an excluded list of publications.  The Unit Administrator shall review the individual publication prior to the rejection of that publication.  Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in its entirety.

3.   Notice of Rejection.  Where a publication is found unacceptable, the Unit Administrator shall promptly advise the inmate in writing of the decision and the reasons for it.  The notice must contain reference to the specific article(s) or material(s) considered objectionable and deemed to pose a threat or detriment to the security, good order or discipline of the facility or to encourage or instruct in criminal activity. The inmate shall be allowed to appeal to the Commissioner or designee within 15 days of receipt of the rejection letter.

4.   Notification to Publisher or Sender.  The Unit Administrator shall provide the publisher or sender of an unacceptable publication a copy of the rejection letter.  The Unit Administrator shall advise the publisher or sender that an independent review of the rejected material may be obtained by writing to the Commissioner or designee within 15 days of receipt of the rejection letter.  The Unit Administrator shall return the rejected publication to the publisher or sender of the material unless the inmate indicates an intent to file an appeal under the inmate grievance procedure, in which case the Unit Administrator shall retain the rejected material at the facility for review.  In case of appeal, if the rejection is sustained, the rejected publication shall

be returned when appeal or legal use is completed.

5.  Quantity Limitations.  The Unit Administrator may set limits locally (for fire, sanitation, housekeeping, security or disciplinary reasons) on the number or volume of publications an inmate may receive or retain in the inmate's quarters in accordance with Administrative Directives 6.10, Inmate Property and 9.4, Restrictive Status and Level 5 Units.  The Unit Administrator may authorize an inmate additional storage space for storage of necessary legal materials in accordance with Administrative Directive 6.10.

N.  Stationery Supplies.  Each correctional facility commissary shall sell: (1) stationery, envelopes, postcards, greeting cards and postage and (2) aerogramme folding letters (for foreign air mail letters).

5.  Telephone Access.  Each Facility Administrator shall provide "collect call only" telephones which allow for outgoing calls in areas specified by the Unit Administrator for inmate use.  Schedules and terms for telephone use shall be posted in telephone areas.  Inmate use of "collect call only" telephones shall be deemed a privilege and not an entitlement.  Use of any telephone may be prohibited by the Facility Administrator in accordance with Administrative Directives 6.14, Security Risk Groups and 9.5, Code of Penal Discipline or to meet any valid penological interest.  If the call is to an attorney, such prohibition shall be based upon a determination relating to the maintenance of security, safety or orderly operation of the facility. The availability or use of any telephones may be restricted or terminated at the discretion of the Commissioner or designee.  Inmates shall not have access to use any facility telephone, other than a "collect call only" telephone, except as authorized in this Directive.

Credit card calls, billing to a third party, call forwarding, transfers or any other method which circumvents collect call billing shall be prohibited.

A.  General Provisions for "Collect Call Only" Telephones.  "Collect call only" telephones shall operate on a Personal Identification Number (PIN) system.  Each inmate shall be required to enter their authorized Personal Identification Number to place a call.  An inmate requesting to use a "collect call only" telephone shall submit a list of no more than ten (10) phone numbers.  The facility shall review the submitted phone numbers and deleted any restricted phone number(s) from the list, e.g., known phone number of victim of the inmate's crime. The list of authorized numbers shall be entered into the phone system and shall constitute the inmate's allowed call list.  Each inmate shall be allowed to change the list of phone numbers once every 30 days.

The Commissioner shall issue a list establishing the authorized number of phone calls allowed.  Each phone call from a collect call only telephone shall be limited to 15 minutes.  The calls may only be made between the hours of 6:00 a.m. and 11:00 p.m.  There shall be no time limit between allowable calls.  Any unauthorized or fraudulent use of the phone system shall subject an inmate to loss of phone privileges in accordance with Administrative

Directive 9.5, Code of Penal Discipline.

B.    <u>Restrictive Status Inmate</u>.  An inmate in punitive segregation status, administrative detention status or transfer detention status in accordance with Administrative Directive 9.4, Restrictive Status and Level 5 Units shall not be allowed to use a "collect call only" telephone except for cause as approved by the Unit Administrator.  An inmate in administrative segregation status in accordance with Administrative Directive 9.4, Restrictive Status and Level 5 Units shall be allowed one (1) phone call up to 15 minutes per week, plus telephone calls to attorneys, as approved by a supervisor.  An inmate on protective custody status in accordance with Administrative Directive 9.4, Restrictive Status and Level 5 Units shall be allowed telephone calls on a comparable basis to inmates in general population, but limited to those periods when protective custody inmates are allowed out of their cells.

C.    <u>Emergency Calls</u>.  Any inmate upon approval by the Shift Commander/Unit Manager, may be allowed to place an emergency call.  Such calls shall be at state expense if the inmate is indigent in accordance with Administrative Directive 6.10, Inmate Property, and shall be listened to and documented in the facility log book in accordance with Administrative Directive 6.2, Facility Post Orders and Logs.

D.    <u>Recording and Listening to "Collect Call Only" Telephone Calls</u>.  Only telephone calls from "collect call only" telephones may be recorded and listened to provided the following provisions are complied with:

   1.    <u>Notification</u>.  A sign in English and Spanish shall be posted at each inmate telephone location which reads:  "Any conversation utilizing these telephones shall be subject to recording and listening."

         Upon admission, each inmate shall be given a form stating that the inmate's telephone calls are subject to recording and listening.  The inmate shall acknowledge reading the form by a legible printed name and signature or by an appropriate assent acknowledged in writing by a staff member.  Any inmate not so consenting shall not be allowed use of the "collect call only" telephones and shall be instructed that any such use shall be unauthorized and in violation of institutional rules.

   2.    <u>Automatic Tone Warning</u>.  Inmate telephone calls shall be recorded in accordance with the provisions of Section 52-570d of the Connecticut General Statutes and any other applicable law.  No call shall be recorded unless the recording is accompanied by an automatic tone warning device which automatically produces a distinct signal that is repeated at intervals of approximately 15 seconds during the communication while such instrument, device or equipment is in use.

   3.    <u>Listening</u>.  Listening shall be authorized only by the Unit Administrator or higher authority when there is reason to believe that such listening is reasonably related to the

1.   Inmate name and number,
2.   Date and name or person making request,
3.   Date and time of call,
4.   Authorizing authority,
5.   Staff placing call,
6.   Number called,
7.   Person contacted,
8.   Duration of call,
9.   Inmate signature, (at completion of call), and
10.  Date and time call completed.

When an inmate's call is terminated due to exigent circumstances, an incident report shall be completed in accordance with Administrative Directive 6.6, Reporting of Incidents.  A copy of the report shall be forwarded to the District Administrator for review.

F.   <u>Listening to Non-Recorded Telephone Calls</u>.
Non-privileged telephone calls conducted on non-recorded telephone lines may be listened to (e.g., on an extension line) provided the following provisions are complied with:

1.   The telephone call is placed by a Department of Correction staff member whose duties include placing of telephone calls for inmates.
2.   The inmate for whom the call is made and the person to whom the call is made are informed by such staff member that the call will be listened to and they both agree to this arrangement.
3.   Such call and listening is reasonably related to a legitimate penological interest.
4.   The inmate signs a statement agreeing to have the conversation listened to.

G.   <u>Termination</u>.  Any call may be terminated for the following reasons: (1) violation of unit rules; (2) illegal activity; (3) exceeding applicable time limits; (4) vandalism or misuse of equipment; (5) threatening or disruptive behavior; (6) in the event of a unit emergency; or (7) for a legitimate penological interest.

H.   <u>Community Residential Telephones</u>.  Each community residential facility shall provide a written directive for telephone use. Such telephones shall not be recorded and/or listened to.

6.   <u>Notification</u>.  Upon admission, each inmate shall be given a form which states, "I have been advised that the Commissioner of Correction has adopted regulations pertaining to mail and telephone use and that these regulations are contained in Sections 18-81-28 through 18-81-51 of the Regulations of Connecticut State Agencies".  The inmate shall acknowledge reading the form by signature.

7.   <u>Disclosure of Correspondence and/or Telephone Conversations</u>.
Information obtained from correspondence and/or telephone calls by correctional staff, pursuant to the provisions of this Directive, shall be disclosed only as reasonably necessary to promote legitimate penological, law enforcement or public safety purposes.

8.    **Exceptions**.  Any exception to the procedures in this Administrative
       Directive shall require the prior written approval of the Commissioner.

# ATTACHMENT B

Christopher Shuckra et al. v. John Armstrong
CV 980580978S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD- NEW BRITAIN, AT
HARTFORD

1999 Conn. Super. LEXIS 705

March 4, 1999, Decided
March 4, 1999, Filed

NOTICE:

[*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

DISPOSITION: Plaintiffs' request for a declaration that the challenged directive violates their constitutional rights denied, as is their request for a temporary restraining order.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff inmates moved the court for an order declaring an administrative directive by the Department of Corrections (Connecticut) unconstitutional and requested a temporary restraining order.

OVERVIEW: Plaintiff inmates moved the court for an order declaring a Department of Corrections' administrative directive unconstitutional, and requested a temporary restraining order. The directive, which prevented plaintiffs from communicating directly with other inmates unless they were related, was established for security reasons. The court denied plaintiffs' motion and request for a temporary restraining order. The regulation was reasonably related to a legitimate penological interest because it was required for inmate safety. The potential existed that inmates could send coded gang messages and information regarding criminal activities to other inmates through the mail. A program was also in place that allowed plaintiffs to communicate indirectly with other inmates through a third-party funneling system. Plaintiffs failed to establish irreparable injury that warranted injunctive relief because the program created a method of communications for

plaintiffs. The security concerns outweighed any purported hardship on plaintiffs.

OUTCOME: The court denied plaintiff inmates' motion for an order declaring the directive unconstitutional and plaintiff inmates' request for a temporary restraining order. The directive was reasonably related to security concerns and plaintiff inmates did not prove that they would suffer irreparable harm if an injunction was not provided.

CORE TERMS: inmate, injunctive relief, directive, temporary restraining order, mail, communicate, failed to demonstrate, sophisticated, hardship, prison, co-plaintiff, prerequisites, declaration

LexisNexis (TM) HEADNOTES - Core Concepts:

Criminal Law & Procedure: Postconviction Proceedings: Imprisonment & Prisoner Rights
[HN1] Courts should be extremely reluctant to interfere with the day to day judgments of corrections officials on matters relating to security in the absence of a substantial, demonstrated need.

JUDGES: Douglas S. Lavine, Judge, Superior Court.

OPINIONBY: DOUGLAS S. LAVINE

OPINION: Memorandum of Decision on Plaintiffs' July 13, 1998 Motion for Court Order and Temporary Injunction

Plaintiffs, housed at the Enfield Correctional Institution at the time this matter was instituted, seek a court ruling that a Department of Correction (DOC) administrative directive is unconstitutional, and injunctive relief. Plaintiffs complain that administrative directive 10.7--

Inmate Communications, prevents them from communicating directly with each other concerning the subject matter of litigation they have pending as co-plaintiffs in various courts. This directive provides that inmates may not communicate directly with other inmates unless they are related. Plaintiffs are unrelated.

Pursuant to a July 13, 1998 Motion for Court Order and Temporary Injunction, an evidentiary[*2] hearing was held on December 8, 1998. Briefs were then filed.

Having reviewed the full record, the plaintiffs' motion is denied, for the following reasons. n1

- - - - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - - - -

n1 In light of the fact that the evidence clearly fails to support plaintiffs' request for a temporary restraining order, or for a declaration that the challenged directive is unconstitutional, I have chosen to decide this case on its merits. Therefore, I have assumed--without deciding--that the complaint on its merits is not barred by res judicata as asserted by the defendant, see page one of defendant's February 9, 1999 memorandum of law. I have also assumed, without deciding, that plaintiffs have standing to bring this case, which the defendant also contests. Finally, I have assumed, without deciding, that the plaintiffs' claims in this case are not barred under the theory of collateral estoppel, as contended by defendant in his February 24, 1999, supplemental memorandum of law.

- - - - - - - - - - - - - - - - End Footnotes - - - - - - - - - - - - - -

1. The regulation at issue meets the test set out in *Turner [*3] v. Safley, 482 U.S. 78, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987),* because it is reasonably related to legitimate penological interests and goals. Warden David Marcial's testimony clearly established that prohibiting direct inmate to inmate communication is required for inmate safety and institutional security given the potential for gang members, and others, to send coded messages through what purports to be legal correspondence, and to use third parties to convey information, including information relating to criminal enterprises. These were the same sorts of concerns cited by Justice O'Connor at pages 91-92 of Turner v. Safley. A very real potential

also exists, Warden Marcial testified, for more sophisticated inmates to manipulate, or gain control over the affairs of other less sophisticated inmates. See also the testimony of prison officials in Turner v. Safley that "mail between institutions can be used to communicate escape plans and to arrange assault and other violent acts." *Turner v. Safley, 482 U.S. at 91.* [HN1] Courts should be extremely reluctant to interfere with the day to day judgments of corrections officials on matters relating to security in the absence of[*4] a substantial, demonstrated need. *Turner v. Safley, 482 U.S. at 78; Lewis v. Casey, 516 U.S. 804, 133 L. Ed. 2d 13, 116 S. Ct. 47 (1996).* Also see *Washington v. Meachum, 238 Conn. 692, 680 A.2d 262 (1995).*

2. The Commissioner of Correction ("Commissioner") has established a procedure pursuant to a contract with the Inmates Legal Assistance Program (ILAP) which permits inmates to communicate indirectly with other inmates, as ILAP Attorney Michael Rubino testified. Under this procedure, ILAP monitors the mail it receives from inmates to ensure that it truly relates to legal matters, and then funnels it to co-plaintiff inmates. Outgoing mail to ILAP is treated as privileged. This protocol substantially permits the communications that plaintiffs seek, while also addressing the security concerns of the Commissioner to his satisfaction. This alternative arrangement to a large extent, moots plaintiffs' concerns. *Turner v. Safley, 482 U.S. at 93.*

3. Plaintiffs have clearly failed to establish the prerequisites for the issuance of a temporary restraining order or injunctive relief, as the Commissioner points out in his February 9, 1999 memorandum. The undersigned judge[*5] agrees with, and incorporates by reference, the observations of United States Magistrate Judge Donna J. Martinez, as expressed on pages 2-3 in her February 11, 1999, decision in the case of Shuckra, et al. v. Armstrong, et al., Civil No. 3:98CV397 (D FM) (D. Conn. February 16, 1999).

Indeed, plaintiffs have failed to establish any of the prerequisites for injunctive relief, particularly given the important security issues present here, the need for the courts to eschew unnecessary interference in the day-to-day running of prisons, the fact that mandatory injunctive relief is being sought, see *Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985),* and the fact that injunctive relief should be granted against a state or municipal official only in cases of "compelling necessity." *Vorbeck v. McNeal, 407 F. Supp. 733, 739 (E.D. Mo.),* aff'd, *426 U.S. 943, 49 L. Ed. 2d 1180, 96 S. Ct. 3160 (1976).* Plaintiffs have failed to demonstrate irreparable injury given the fact that the Commissioner has established a method for indirect communication, as outlined above, through ILAP. Plaintiffs have failed to

demonstrate a likelihood of success. See cases cited by the Commissioner [*6]on pages 9-10 of his February 9, 1999 brief, including but not limited to *Bounds v. Smith, 430 U.S. 817, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977),* and *Weaver v. Toombs, 756 F. Supp. 335, 338 (W.D. Mich. 1989).* The balance of hardships do not tip in plaintiffs' favor, and any purported hardship is outweighed by the legitimate security concerns recognized in Turner v. Safley and voiced by Warden Marcial. In this case, then, the evidence clearly militates against granting a temporary restraining order or other injunctive relief.

Conclusion

Plaintiffs' request for a declaration that the challenged directive violates their constitutional rights is denied, as is their request for a temporary restraining order.

Douglas S. Lavine

Judge, Superior Court

# ATTACHMENT C



[☒] Original Contract # _____
[☐] Amendment: _____
Max. Contract $  739,647
Contract Contact Person  Sydney T. Schulman
Contact Phone  **860-522-2960**
Revised 04/03/03 (MSW-97poscov2)
(For Internal Use Only)

## STATE OF CONNECTICUT
## HUMAN SERVICE CONTRACT
## PART I

The State of Connecticut Department   **Of Correction**

Street:   **24 Wolcott Hill Road**

City:   **Wethersfield**                          State:   **CT**   Zip:   **06109-1152**

Tel#:   **860-692-7757**                     hereinafter "the department",

hereby enters into a contract with:

Contractor's Name:   **Sydney T. Schulman dba Schulman & Associates**

Street:   **10 Grand Street**

City:   **Hartford**                              State:   **CT**   Zip:   **06106-1596**

Tel#:   **860-522-2960**                     FEIN/SS#: _____

hereinafter "the contractor",  for the provision of services outlined herein.

1.   **This contract is in effect from   09/01/2003   through    06 /30/2004.**

2.   **Contractor is a set aside contractor pursuant to § 32-9e of the Conn. Gen. Stat.: [☐] YES  [☒] NO**

3.   **The contractor shall perform the specific services as described in accordance with:**

   **PART II:** Contract terms required by the department, consisting of     pages, numbered consecutively beginning with page   ;
   **PART III:**  Specific terms for contract performance, statement of compensation and terms of payment, consisting of     pages, numbered consecutively beginning with page    and ending with the Acceptances and Approvals page, numbered    .
   **Workforce Analysis:** The contractor has provided the Workforce Analysis affirmative action report, attached hereto and made a part hereof, related to employment practices and procedures.

4.   **Statutory Authority:**  The Department is authorized to enter into this contract pursuant to § 4-8, 18-81 and 18-101i of the Connecticut General Statutes.

5.    **Effective Date:**  This contract shall become effective only as of the date of signature by the department's authorized official(s) and, where applicable, the date of approval by the Attorney General. Upon such execution, this contract shall be deemed effective for the entire term specified in Section 1, above. This contract may be amended pursuant to Section 6.

6.    **Contract Revisions and Amendments:**  (a) A formal contract amendment, in writing, shall not be effective until executed by both parties to the contract, and, where applicable, the Attorney General.  Such amendments shall be required for extensions to the final date of the contract period and to terms and conditions specifically stated in Part II or Part III of this contract, including but not limited to revisions to the maximum contract payment, to the unit cost of service, to the contract's objectives, services, or plan, to due dates for reports, to completion of objectives or services, and to any other contract revisions determined material by the department.

(b) The contractor shall submit to the department in writing any proposed revision to the contract and the department shall notify the contractor of receipt of the proposed revision. Any proposal deemed material shall be executed pursuant to (a) of this section. The department may accept any proposal as a technical amendment and notify the contractor in writing of the same. A technical amendment shall be effective on the date approved by the department, unless expressly stated otherwise.

(c)  No amendments may be made to a lapsed contract.

7.    **Liaison:**  Each party shall designate a liaison to facilitate a cooperative working relationship between the contractor and the department in the performance and administration of this contract.

8.    **Cancellation and Recoupment:**  (a) This agreement shall remain in full force and effect for the entire term of the contract period specified in Section 1, above, unless either party provides written notice ninety (90) days or more from the date of termination, except that no cancellation by the contractor may be effective for failure to provide services for the agreed price or rate and cancellation by the department shall not be effective against services already rendered, so long as the services were rendered in compliance with the contract during the term of the contract.

(b) In the event the health or welfare of the service recipients is endangered, the department may cancel the contract and take any immediate action without notice it deems appropriate to protect the health and welfare of service recipients.  The department shall notify the contractor of the specific reasons for taking such action in writing within five (5) business days of cancellation. Within five (5) business days of receipt of this notice, the contractor may request in writing a meeting with the commissioner of the department or his/her designee. Any such meeting shall be held within five (5) business days of the written request. At the meeting, the contractor shall be given an opportunity to present information on why the department's actions should be reversed or modified. Within five (5) business days of such meeting, the commissioner of the department shall notify the contractor in writing of his/her decision upholding, reversing or modifying the action of the department. This action of the commissioner shall be considered final.

(c)  The department reserves the right to cancel the contract without prior notice when the funding for the contract is no longer available.

(d)  The department reserves the right to recoup any deposits, prior payment, advance payment or down payment made if the contract is terminated by either party. Allowable costs incurred to date of termination for operation or transition of program(s) under this contract shall not be subject to recoupment. The contractor agrees to return to the department any funds not expended in accordance with the terms and conditions of the contract and, if the contractor fails to do so upon demand, the department may recoup said funds from any future payments owing under this contract or any other contract between the state and the contractor.

9.    **Transition after Termination or Expiration of Contract:**  In the event that this contract is terminated for any reason except where the health and welfare of service recipients is endangered or if the department does not offer the contractor a new contract for the same or similar service at the contract's expiration, the contractor will assist in the orderly transfer of clients served under this contract as required by the department and will assist in the orderly cessation of operations under this contract. Prior to incurring expenses related to the orderly transfer or continuation of services to service recipients beyond the terms of the contract, the department and the contractor agree to negotiate a termination amendment to the existing agreement to address current program components and expenses, anticipated expenses necessary for the orderly transfer of service recipients and changes to the current program to address service recipient needs. The contractual agreement may be amended as necessary to assure transition requirements are met during the term of this contract. If the transition cannot be concluded during this term, the department and the contractor may negotiate an amendment to extend the term of the current contract until the transition may be concluded.