30.    The Plaintiff was then escorted shortly after said call from 1 East unit cell 216 by co-defendant C.O. Farley.

31.    The plaintiff was escorted to the A/P room fully restrained, i.e., leg irons and handcuffs connected with a tethered chain.

32.    Upon arriving in the A/P room, the plaintiff was placed in the cell number four which is famous for being the place were confined people like the plaintiff were subjected to assaults by guards because this cell was and is without a surveillance camera trained on it like cells one (1) through three (3).  Upon information and belief, the cells with the video cameras trained upon them could have accommodated the plaintiff.

33.    Co-defendant C.O. Farley told the plaintiff to kneel on the bench facing the wall, with the plaintiff's back to the cell door, which is proper procedure, so that he could remove the leg irons and tethered chain.

34.    As the plaintiff was kneeling facing the wall, he heard another person enter the cell and immediately felt a huge debilitating slap to his right ear and facial area, causing extreme pain.

35.    The plaintiff was then choked by defendant C.O. Smiley who stated to the plaintiff, "Who's the nigger now; huh?"  "Who's the nigger now—you punk motherfucker. You do or say anything about what I did to you and your punk-ass celly, (referring to the August 31st, 2001 incident) I'm going to make your life miserable.  Don't you know I can get away with murder if I wanted to."  Thereafter, defendant Smiley spat in the face of the

7

plaintiff while still choking the plaintiff and slapped the back of the plaintiff's head extremely forcefully.

36.    Co-defendant C.O. Farley just watched and did nothing to intervene to assist the plaintiff, but instead operated as a look out for co-defendant C.O. Smiley in an effort to assist C.O. Smiley.

37.    At this time, the plaintiff is still handcuffed in the back and thus defenseless.

38.    As plaintiff remained in the kneeling position on the bench as co-defendant C.O. Smiley repeatedly spat in the plaintiff's face while choking him.

39.    Co-defendant C.O. Farley was present not more than 10 feet away from this assault and he simply watched and did nothing to intervene to protect me.

40.    Thereafter, the co-defendant C.O. Smiley, after forcefully slapping the plaintiff in the back of the head, choking him, spitting on the plaintiff and threatening him, C.O. Farley exited the cell at or around 08:24:42 hours and at or around 08:25:56 hours leaving the plaintiff in the kneeling position with spittle on his face and in pain from his ear, facial area and throat.  Once the cell door closed and the plaintiff was alone in the cell, he got up.

41.    The plaintiff then went to the cell door to have the handcuffs removed were co-defendant C.O. Smiley was located awaiting the plaintiff to remove the handcuffs.  The handcuffs were never removed.

42.    The plaintiff approached the cell door and noticed defendant Lt. Salius standing behind defendant C.O. Smiley.

8

43.     Upon information and belief, co-defendant Lt. Salius watched the entire incident and did nothing to intervene and protect the plaintiff and/or discipline co-defendants Smiley and Farley, his subordinates.

44.     The plaintiff, thereupon informed defendant Lt. Salius of C.O. Smiley's attack upon him and Lt. Salius ignored the plaintiff's complaint and his demand for medical attention.

45.     From the locked cell door, the plaintiff, still handcuffed behind his back, spat in defendant C.O. Smiley's face.

46.     Thereafter, co-defendant Lt. Salius in complete dereliction of his duty, allowed defendant C.O. Smiley to reenter the cell and violently lunge at the plaintiff, then bang the handcuffed plaintiff's head into the wall while repeatedly punching his body and head as the plaintiff was taken to the floor, picked up off of the floor and while being placed on a cell bench.

47.     All the while, the plaintiff yelled for Lt. Salius to help him as defendant C.O. Smiley jammed his knee into the handcuffed plaintiff's back, while ramming his fingers into the plaintiff's neck and throat not in a manner, which was not consistent with a good faith attempt to maintain or restore discipline.

48.     Defendant Lt. Salius covered up the incident as if the plaintiff's life meant nothing by falsely reporting the incident.

49.     Lt. Salius falsely stated in his report that he never saw defendant C.O. Smiley assault the plaintiff.

9

50.     Defendant C.O.'s Smiley, Farley, Galinsky and/or Stewart who allegedly witnessed the plaintiff spit on defendant C.O. Smiley, failed to notify defendant Lt. Salius, nor did C.O. Smiley seek immediate medical treatment.

51.     Defendant Salius did not relieve C.O. Smiley immediately to obtain medical treatment nor did he stop C.O. Smiley from reentering the cell to further assault the plaintiff, who suffered injuries.

52.     Co-defendant Lt. Salius falsely reports that the plaintiff spat in defendant C.O. Smiley's face in retribution for the August 31, in his attempt to cover up the assault which C.O. Smiley perpetrated upon the plaintiff that occurred in cell four.

53.     Upon information and belief, co-defendant Major Coates prior to and/or on August 1, 2002, conspired and combined with other defendants in an attempt to minimize C.O. Smiley's exposure to liability for this incident.

54.     On September 5, 2001 Lt. Salius authored a report which concluded with the following paragraph: "Officer C.O. Smiley did unsecure, and acting on his own accord without direction entered the cell without first notifying this supervisor. Had he notified this supervisor a planned use of force reaction to incident could have been implemented. This supervisor recommends further review of this incident." When the plaintiff first got this report the aforementioned paragraph was deliberately covered to hide the incriminating evidence. On July 29, 2002, the plaintiff wrote Major Coates about the fact that the report he had had been redacted. On August 1, 2002, Maj. Coates falsely replied in writing that, "Items may be redacted for safety and security reasons." This false answer was simply an attempt to thwart

the plaintiff's constitutional rights to fully publish and protest his grievances consistent with his free speech rights and harm his reputation for reporting DOC employee abuse of prisoners.

55.    Defendants Galinsky and Stewart both provided falsified statements that they watched the plaintiff spit in defendant C.O. Smiley's face.

56.    Further, both co-defendants C.O. Galinsky and Stewart failed to stop defendant C.O. Smiley from reentering the cell to assault the plaintiff and failed to notify their superior, co-defendant Lt. Salius, who was in the A/P room that he should intervene.

57.    Defendant Young also submitted a false statement to cover up the incident in violation of the above.

58.    Defendant Capt. Zacharewicz who was not in the A/P room at the time of the assaults upon the plaintiff, submitted a false report of the incident in an effort to illegally assist the co-defendants with whom he was in conspiracy.

59.    Capt. Zacharewicz's report stated among other things; that a spit mask was used and justified the assault upon the plaintiff, however his report contradicted that of co-defendant Lt. Salius, who reported that no spit net/mask was available. This, upon information and belief, illustrates co-defendant Capt. Zacharewicz's effort to combine with the other co-defendants to cover up the misconduct of the of the other correction officers and co-defendants.

60.    The plaintiff, for no justifiable reason, was beaten so severely and with such force and impact that he was left with no strength and was reduced to a state of semi-consciousness.

11

61.     Co-defendants Nurse Practioner Feinberg and Medical Supervisor Wollenhaupt failed to provide the plaintiff with adequate medical care as to both the August 31, 2001 and the September 5, 2001 incidents.

62.     Co-defendants Nurse Practioner Feinberg and Medical Supervisor Wollenhaupt falsified medical incident reports and medical charts to down play and minimize the injuries inflicted on the restrained plaintiff by defendant C.O. Smiley and staff.

63.     Pictures of the plaintiff's injuries clearly show contusions and abrasions to parts of the plaintiff's body while defendant Wollenhaupt and Feinberg fabricated their reports in conspiracy with the other co-defendants.

64.     On September 5, 2001, one or more of the co-defendant correction officers, spat and rammed their fingers into the neck and throat of the handcuffed plaintiff; while they delivered body blows upon the restrained plaintiff.

65.     The plaintiff informed co-defendant Majors Lajoie, Whidden, and Coates of C.O. Smiley's and the other co-defendant C.O.'s misconduct, however, in complete dereliction of their supervisory duties, failed to rectify the incident by ignoring the matter despite the fact that, upon information and belief, they were aware of C.O. Smiley's history of abusive misconduct toward other individuals in the custody of the Department of Corrections, such as inmate Kenneth Pladsen.

66.     Co-defendant Majors Coates, Whidden, Lajoie and Myers conspired to deny free speech rights and due process to the plaintiff and participated in an ongoing attempt to conspire to cover-up the defendants' physical abuse of the plaintiff, by not allowing the

12

plaintiff to defend himself in the disciplinary court; that is the denial of the opportunity to fight the conspiratorially planned disciplinary action that also resulted in severe administrative sanctions.

67.    The plaintiff filed a grievance on the September 5, 2001 beating which was denied by co-defendant Myers in a flagrant attempt to cover up the beating.

68.    Defendant Oulette since taking over as grievance coordinator has deliberately "lost" or denied receiving the plaintiff's level I or level II grievances submitted after being denied by co-defendant Myers, hence, upon information and belief, Oulette conspired with the defendants to hamper the plaintiff's efforts to exhaust his administrative remedies and illegally suppress his rights to free speech.

69.    The plaintiff repeatedly wrote co-defendant Deputy Commissioner Matos concerning grievance "141-01-531" that went unanswered, hence manifested an attempt minimize and cover-up the assaults upon the plaintiff and represented an infringement of the plaintiff's free speech rights.

70.    As a consequence of the actions of the defendants herein described, and the omissions of the defendants, the plaintiff suffered humiliation, degradation, injury to his head, noise, sinuses, impairment of vision, right knee, back, neck, chest, ribs, shoulders, wrists, ankles, Achilles tendon, memory lapses, abrasions, a black eye, lacerations, bruises, swelling to his head and to the side of his face and back, and contusions about his body, physical pain and disability and fear for his life, creating mental and emotional anguish and distress and injury to his reputation for the truthful reporting of DOC employee physical abuse of inmates.

13

71.   In the manner described above, the defendants, by uniting in an act which constituted a wrong to the plaintiff, and by performing it under the aforementioned circumstances which fairly charge them with the consequences which follow, incurred a joint and several liability for the acts of each and all of the joint participants. All of the defendants actively participated in the above-described wrongful acts and misconduct by cooperation or request, and as to each act complained of, lent aid or encouragement to the wrongdoer, thus ratifying and adopting each wrongful act for their own.

72.   In the manner described in this Complaint, the defendants and each of them, separately and in concert, deprived the plaintiff of his rights to be free from illegally inflicted physical injury, to freedom of speech, freedom to petition for redress of grievances, right to privacy, right to bodily integrity, the right to be free from the conspiracy to conceal the abuse to which the plaintiff was subjected and otherwise deprive him of his civil rights and due process of law. All of these rights are secured to the plaintiff by the provisions of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution and by Title 42 U. S. C. §1983.

73.   The misconduct attributed to each of the defendants was a misuse of his authority that was personal to him and was not primarily employer rooted or reasonably incidental to the performance of employment duties, further, said misconduct was not designed to advance any interest of his employer, the State, and did not serve any legitimate State interest, rather the defendants' misconduct was motivated by purely personal considerations entirely extraneous to the employer's interest.

14

## COUNT TWO
## STATE LAW CLAIMS

1.      Pursuant to the provisions of 28 U. S. C. §1367, the supplemental jurisdiction of this Court is invoked as to the claims of this count, which arise under the Constitution, statutes and common law of the State of Connecticut.

2.      This is an action for money damages to redress the deprivation by the defendants of rights secured to the plaintiff by the State of Connecticut.  The co-defendants with the assistance, complicity and in conspiracy with each other, subjected the plaintiff to a violation of the plaintiff's rights to freely speak, write and publish his sentiments and or grievances under Art. I, §§4, 5 & 14 of the State Constitution and his right to adequate medical care, to be free from physical abuse and injury to his reputation for reporting DOC employee prisoner abuse under Art. I, §§7, 8, 9 & 10  of the State Constitution.  Moreover, the co-defendants with the assistance, complicity and in conspiracy with each other, subjected the plaintiff to battery, the intentional infliction of emotional distress, negligent infliction of emotional distress, negligence and false imprisonment.

3-73.  Paragraphs 3 through 73 of Count One are hereby incorporated as paragraphs 3-73 of Count Two.

74.     In the manner described above, the defendants and each of them committed a violation of the plaintiff's State Constitutional rights under Art. I, §§4, 5 & 14, to free speech, in that they attempted and were successful in that attempt, by inflicting upon the plaintiff without justification or excuse a suppression of his right and obligation to grieve all of the misconduct to which he was subjected during his confinement.  The acts and omissions of the

15

defendants, as outlined above, were the proximate cause of damages to the plaintiff as set out in paragraphs 66 through 73 in Count One, above. The plaintiff is protected against such conduct by the defendants under Connecticut law, the provisions of which are invoked under this Court's supplemental jurisdiction.

75.    In the manner described above, the defendants and each of them committed a violation of the plaintiff's State Constitutional rights under Art. I, §§7, 8, 9 & 10, to be free from governmental abuse, to the right to be secure in his person and reputation as previously pleaded, and the right to adequate medical treatment. The acts and omissions of the defendants, as outlined above, were the proximate cause of damages to the plaintiff as set out in paragraphs 66 through 73 in Count One, above. The plaintiff is protected against such conduct by the defendants under Connecticut law, the provisions of which are invoked under this Court's supplemental jurisdiction.

76.    In the manner described above, the defendants and each of them committed battery, in that they attempted with force and violence to do corporeal offense to the plaintiff, and were successful in that attempt, by inflicting upon the plaintiff's person severe physical injury without justification or excuse with respect to both the August 31, 2001 and September 5, 2001 incidents. The acts and omissions of the defendants, as outlined above, were the proximate cause of damages to the plaintiff as set out in paragraphs 66 through 73 in Count One, above. The plaintiff is protected against such conduct by the defendants under Connecticut law, the provisions of which are invoked under this Court's supplemental jurisdiction.

16

77.     In the manner described above, the defendants further committed the tort of intentional and/or negligent infliction of emotional distress, in that they intentionally, negligently and/or recklessly caused the plaintiff severe emotional distress by their intentional, extreme and outrageous conduct, as described above. The acts and omissions of the defendants, as outlined above, were the proximate cause of damages to the plaintiff as set out in paragraphs 66 through 73 in Count One, above. Therefore, the plaintiff is entitled to relief under the laws of Connecticut, and provision of which are invoked under this Court's supplemental jurisdiction.

78.     The defendants subjected the plaintiff to the tort of negligence in the performance of their correctional duties, in that they jointly and severally owed him a duty to protect him from injury, inasmuch as he was in their custody. Therefore, insofar as each defendant allowed the plaintiff to be subjected to illegal and tortuous conduct by the others, as detailed above, they are liable for their breach of the duty owed by a correctional officer to a person in his custody. The acts and omissions of the defendants, as outlined above, were the proximate cause of damage to the plaintiff as set out in paragraphs 66 through 73 in Count One, above. Therefore, the plaintiff is entitled to relief under the laws of Connecticut, and provision of which are invoked under this Court's supplemental jurisdiction.

79.     The defendants subjected the plaintiff to false imprisonment, in that they acted in a manner designed to illegally confine the plaintiff in punitive and administrative segregation, they forced him to be aware of his segregated status; lacking legal justification for the segregation, they had no privilege to so segregate him. The plaintiff's right to be free of

17

such treatment by duly authorized correctional officers is protected by the provisions of the laws of the State of Connecticut, which are invoked under this Court's supplemental jurisdiction.

**WHEREFORE**, the plaintiff, claims judgment against the defendants and each of them, jointly and severally, as follows:

A.    Compensatory damages;

B.    Punitive damages;

C.    Attorney fees and costs of this action;

D.    Issue the following prospective injunctive relief, as follows:

   1.    Remove the plaintiff from NCI immediately, place him in Webster C.I. in general population with all restored privileges.

   2.    Remove all disciplinary action taken against the plaintiff for his alleged conduct stemming from the August 31st and the September 5th, 2001 incidents from his institutional record and reinstate any and all credit, privileges and/or other rights he might have lost as a result of said discipline.

   3.    Immediately install a functioning video camera in cell number 4 of the AP room of NCI no later than 4 business days from the issuance of this order.

   4.    The Department of Corrections is ordered to institute a system of recorded receipts for all grievance stages, and,

E.    Issue Declaratory relief pursuant to 28 U.S.C §§2201 and 2202, as follows:

   1.    The August 31st and the September 5th, 2001 physical assaults upon the plaintiff by C.O. Smiley constituted a violation of the plaintiff's rights under the 1st, 4th, 5th and 14th Amendments to the U.S. Constitution, of Art. I, §§4th, 5th, 7th, 8th , 9th, 10th and 14th   of the Connecticut Constitution and constituted a battery, the

18

intentional infliction of emotional distress, negligent infliction of emotional distress, negligence and false imprisonment, and

2.  That the remainder of the co-defendants pleaded herein violated plaintiff's rights under the 1st, 4th, 5th and 14th Amendments to the U.S. Constitution, of Art. I, §§4th, 5th, 7th, 8th, 9th, 10th and 14th of the Connecticut Constitution and constituted a battery, the intentional infliction of emotional distress, negligent infliction of emotional distress, negligence and false imprisonment through their physical assault upon the plaintiff, their failure to protect the plaintiff, their failure to provide medical care to the plaintiff, their concerted efforts to cover up the violations of the plaintiff's rights by suppressing his grievance rights and by other means previously pled herein; and

F.  Such further relief as this Court deems appropriate to award.

                    RAMON LOPEZ
                    THE PLAINTIFF

BY:     _____
        ATTY. ERSKINE D. McINTOSH
        FEDERAL BAR NO. CT 09743
        THE LAW OFFICES OF ERSKINE D. McINTOSH, P.C.
        3129 WHITNEY AVENUE, SECOND FLOOR
        HAMDEN, CT 06518-2364
        (203) 787-9994
        FAX (203) 848-1213

        COUNSEL FOR THE PLAINTIFF

        C E R T I F I C A T I O N

    This is to certify that a copy of the foregoing was sent by first-class mail, postage prepaid on this the _30_ day of March, 2004 to:

Atty. Robert F. Vacchelli
Assistant Attorney General
110 Sherman Street
Hartford, Conn. 06105

                    _____
                    ATTY. ERSKINE D. McINTOSH

19 Complaint-Amended-Lopez

1              UNITED STATES COURT OF APPEALS

2                 FOR THE SECOND CIRCUIT

3

4                    August Term 2003

5        (Submitted April 6, 2004    Decided April 23, 2004)

6                  Docket No. 02-0340

7    ------------------------------------------------------x

8    Duane Ziemba,
9
10                  <u>Plaintiff-Appellant</u>,
11
12                    -- v. --
13
14   George Wezner, I/O, John Armstrong, I/O, P. Calcinari, I/O,
15   R. Muccino, I/O, P. Peters, I/O, E. Saundry, I/O, J. Bulger,
16   I/O, T. Torres, I/O, J. Bandzak, I/O, Brian Zawalinski, I/O,
17   Cicero Callender, I/O, Garland Shell, I/O, D. J. Harris,
18   I/O, Sean Cullagh, I/O, William O'Connor, I/O, Jonathan
19   Moore, I/O, All Defendants,
20
21                 <u>Defendants-Appellees</u>.
22
23   ------------------------------------------------------x
24
25   B e f o r e :   WALKER, <u>Chief Judge</u>, VAN GRAAFEILAND and
26                   STRAUB, <u>Circuit Judges</u>.

27       Appeal from an order of the United States District

28   Court for the District of Connecticut (Donna F. Martinez,

29   <u>Magistrate Judge</u>) dismissing plaintiff-appellant's suit

30   under 42 U.S.C. § 1983 pursuant to Fed. R. Civ. P. 12(c) for

31   failing to exhaust his administrative remedies in compliance

32   with the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

33       VACATED and REMANDED.

34

— _Addendum III_  —

DUANE ZIEMBA, pro se, Somers,
CT, for Plaintiff-Appellant
(on submission).

MATTHEW B. BEIZER, Assistant
Attorney General for the State
of Connecticut (Richard
Blumenthal, Attorney General,
on the brief), Hartford, CT,
for Defendants-Appellees (on
submission).

PER CURIAM:

Plaintiff-Appellant Duane Ziemba, pro se, appeals from

an order of the United States District Court for the

District of Connecticut (Donna F. Martinez, Magistrate

Judge) dismissing his 42 U.S.C. § 1983 action on the

pleadings pursuant to Fed. R. Civ. P. 12(c) for failing to

exhaust his administrative remedies, as required by the

Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

In February 2002, Ziemba filed an amended § 1983

complaint, alleging violations of rights conferred under the

Eighth and Fourteenth Amendments of the United States

Constitution, as well as Connecticut state law.  In the

complaint, he alleges the following facts to support his

claims:  While was incarcerated at Cheshire Correctional

Facility, he had filed an emergency grievance requesting

that prison officials protect him from his cell mate,

Patrick Wright, because Wright had a mental disorder and had

a history of assaultive behavior and keeping weapons in his

2

1    cell.  Prison officials took no measures to protect him,

2    and, as a result, on September 9, 1997, Wright stabbed him.

3    After the stabbing, he was placed in a stripped segregation

4    cell, denied medical care, and threatened by a prison

5    official, who also instructed other prison officials not to

6    place any mention of the stabbing on the prison record.

7         Ziemba further alleges that he was taken to a holding

8    cell at the Middletown Courthouse for a previously scheduled

9    court appearance, at which time the courthouse sheriffs and

10   other officials refused to allow Ziemba to appear in court

11   due to his shocking condition; and that the Middletown Court

12   officials ultimately telephoned Cheshire Correctional

13   Facility in an attempt to assist Ziemba.  Upon returning to

14   Cheshire, Ziemba alleges, various officer defendants, in

15   retaliation for the telephone call from Middletown,

16   continued to detain him in segregation and refused him food

17   and medical care.

18        Ziemba also alleges that prison officials escorted him

19   to an empty shower room on September 12, 1997, and

20   threatened him, intimidated him with police dogs, beat him,

21   and sprayed pepper spray in his eyes and mouth.  After the

22   beating, Ziemba alleges, prison officials placed him in

23   four-point restraints on a bed in the segregation unit,

24   where he was denied medical care; the same day, prison

3

1    officials transferred him to Northern Correctional Facility,
2    where he was given medical attention after being observed by
3    the medical staff.

4         At his behest, Ziemba's family sent numerous complaints
5    regarding the above-described incidents to John Armstrong,
6    Commissioner of the Connecticut Department of Corrections,
7    which went unanswered and unreturned.  Ultimately, his
8    family initiated an FBI investigation.

9         The State of Connecticut answered Ziemba's amended
10   complaint, asserting, _inter alia_, that Ziemba had failed to
11   exhaust his administrative remedies, as the PLRA requires.
12   The State then moved for judgment on the pleadings.  Ziemba
13   opposed the Rule 12(c) motion, arguing (1) that the State
14   was precluded from asserting the exhaustion defense because
15   prison officials prevented Ziemba from exhausting his
16   administrative remedies by beating him, threatening him,
17   denying him grievance forms and writing implements, and
18   transferring him to another prison; (2) that his complaints
19   to the FBI constituted an informal exhaustion of his
20   administrative grievances sufficient to satisfy the PLRA's
21   exhaustion requirement; and (3) that, in any case, the
22   ongoing FBI investigation rendered his claims non-grievable
23   under Connecticut Department of Corrections Administrative
24   Directive 9.6.  On October 29, 2002, the district court

4

1    granted the State's motion for judgment on the pleadings and

2    dismissed Ziemba's § 1983 action for failure to exhaust.

3    Ziemba filed a timely appeal.

4

5                              **DISCUSSION**

6        We review a district court's judgment on the pleadings

7    de novo.   See King v. Am. Airlines, Inc., 284 F.3d 352, 356

8    (2d Cir. 2002).  "In deciding a Rule 12(c) motion, we apply

9    the same standard as that applicable to a motion under Rule

10   12(b)(6), accepting the allegations contained in the

11   complaint as true and drawing all reasonable inferences in

12   favor of the nonmoving party."  Burnette v. Carothers, 192

13   F.3d 52, 56 (2d Cir. 1999).

14       Under the PLRA, 42 U.S.C. § 1997e(a), "[n]o action

15   shall be brought with respect to prison conditions under

16   [section 1983], or any other Federal law, by a prisoner

17   confined in any jail, prison, or other correctional facility

18   until such administrative remedies as are available are

19   exhausted."  As the Supreme Court clarified in Porter v.

20   Nussle, 534 U.S. 516 (2002), "the PLRA's exhaustion

21   requirement applies to all inmate suits about prison life,

22   whether they involve general circumstances or particular

23   episodes, and whether they allege excessive force or some

24   other wrong."  Id. at 532.  Following the Nussle decision,

                                  5

1    we held that "retaliation claim[s] fit[] within the category

2    of 'inmate suits about prison life,' and therefore must be

3    preceded by the exhaustion of state administrative remedies

4    available." Lawrence v. Goord, 304 F.3d 198, 200 (2d Cir.

5    2002).  Accordingly, Ziemba's claims fall within the purview

6    of the PLRA's exhaustion requirement.

7        However, on appeal, Ziemba argues that the State should

8    have been estopped from asserting exhaustion as an

9    affirmative defense.  Although Ziemba did not use the

10   technical term "estoppel" in the court below, we have

11   reviewed the record on appeal and are satisfied that the

12   argument was effectively presented to the district court

13   when his counsel argued that Ziemba's inability to exhaust

14   "was the direct result of the defendants' actions . . ."

15       It is now well-settled in this Circuit that exhaustion

16   under the PLRA is not jurisdictional, see Richardson v.

17   Goord, 347 F.3d 431, 434 (2d Cir. 2003), and that it is an

18   affirmative defense, see Jenkins v. Haubert, 179 F.3d 19,

19   28-29 (2d Cir. 1999).  The Fifth Circuit has held that the

20   PLRA's exhaustion requirement "may be subject to certain

21   defenses such as [] estoppel." See Wright v. Hollingsworth,

22   260 F.3d 357, 358 n.2 (5th Cir. 2001); see also Lewis v.

23   Washington, 300 F.3d 829, 834 (7th Cir. 2002) (finding the

24   Fifth Circuit's ruling in Wright persuasive "because

6

1    nonjurisdictional prerequisites to suit in federal court are

2    typically subject to equitable estoppel," but declining to

3    decide whether the PLRA's exhaustion defense is subject to

4    equitable estoppel because the prisoner did not satisfy the

5    requirements for equitable estoppel).

6        As a matter of first impression in this circuit, we

7    hereby adopt the holding of <u>Wright</u>, 260 F.3d at 358 n.2, and

8    hold that the affirmative defense of exhaustion is subject

9    to estoppel.  Accordingly, because the district court

10   erroneously did not address Ziemba's claim that defendants'

11   actions may have estopped the State from asserting the

12   exhaustion defense, we vacate and remand the decision of the

13   district court.

14       On remand, the district court is directed to consider

15   Ziemba's claim that estoppel bars the State's assertion of

16   the exhaustion defense.  Because such consideration will

17   require the court to look beyond the pleadings and the

18   documents attached to the pleadings, the district court must

19   allow factual development and address the estoppel claim at

20   the summary judgment stage.  <u>See</u> Fed. R. Civ. P. 12(c) ("If,

21   on a motion for judgment on the pleadings, matters outside

22   the pleadings are presented to and not excluded by the

23   court, the motion shall be treated as one for summary

24   judgment and disposed of as provided in Rule 56, and all

7

1    parties shall be given reasonable opportunity to present all

2    material made pertinent to such a motion by Rule 56"); Fed.

3    R. Civ. P. 56.

4        We note that Ziemba also argues on appeal that his

5    complaints to the FBI, and the subsequent FBI investigation,

6    amounted to exhaustion of his administrative remedies.  We

7    express no opinion here as to whether the FBI investigation

8    satisfies the exhaustion requirement.  We observe, however,

9    that we have recently appointed counsel in a group of cases

10   to test the limits of unconventional exhaustion, which, when

11   decided, may prove relevant to the district court's analysis

12   of exhaustion on remand.  See, e.g., Hemphill v. State of

13   New York, No. 02-0164; Abney v. Dep't of Corr., No. 02-0241;

14   Ortiz v. McBride, No. 02-0088; Johnson v. Reno, No. 02-

15   0145.

16

17                            **CONCLUSION**

18       For the foregoing reasons and with the foregoing

19   instructions, the district court's order dismissing Ziemba's

20   suit is hereby VACATED and REMANDED.

21

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

---

*Connecticut Financial Center*
*157 Church Street*
*P.O. Box 1824*
*New Haven, Connecticut 06510*

*(203) 821-3700*
*Fax (203) 773-5373*
*www.usdoj.gov/usao/ct*

August 11, 2003

Raymon Lopez
Inmate # 261685
Northern Correctional Institute
P.O. Box 665
Somers, Connecticut 06071

Dear Mr. Lopez:

This is in response to your letter of May 28, 2003 which we received on June 9, 2003. In you letter you indicate that you are looking for the initiation of a federal investigation into an assault by correctional officers. I have forwarded your letter on to the Federal Bureau of Investigation and have asked them to look into the matter.

Very truly yours,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

JOHN B. HUGHES
CHIEF, CIVIL DIVISION

JBH:lfd

*Addendum II*

# INVESTIGATION REPORT COVER SHEET

FACILITY:

**Northern C.I.**

CASE #:

**II 02-37**

SUBJECT:

**Inmate Allegation of Staff Misconduct**

DATE REPORT SUBMITTED:

**June 17, 2002**

SOURCE AND DATE OF REFERRAL:

**Director of Security Vincent Santopietro
March 28, 2002**

INVESTIGATION COMPLETED BY:

**Lieutenant Raymond Rochefort**

INVESTIGATORS ASSIGNED:

**Captain Jeff Gray
Lieutenant Raymond Rochefort**

OTHER AGENCIES INVOLVED:

**Connecticut State Police
Troop "C" Tolland**

— *Addendum* Ⅴ —




# State of Connecticut
## Department of Correction
### Security Division, Investigation Unit
24 Wolcott Hill Road
Wethersfield, CT 06109

To:   Vincent A. Santopietro
      Director of Security

From: Raymond Rochefort
      Lieutenant, Investigator
      Jeffrey J. Gray
      Captain, Investigator

Date: 6/17/02

Ref:  **II 02-37:** Inmate Allegation of Employee Misconduct (Assault).
      Inmate Ramon Lopez, CJIS #261685, Northern Correctional Institution, Somers
      CT. (Correction Officer James Smiley)

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

### Historical Perspective

On 3/27/02, Department of Correction Deputy Commissioner of Field and Security
Dennis Coyle, received written correspondence from Northern Correctional Institution
(NCI) inmate Ramon Lopez (CJIS #261685) who reported being assaulted on two (2)
separate occasions by NCI Correction Officer James Smiley.

Inmate Lopez reported that between 3:00am and 4:00am on 8/31/01, Officer Smiley
entered his two man cell (1-East/216), without Supervisory authorization, and beat
both he and his cell partner, Thomas Nedweden (#▮▮▮▮▮▮▮), about the head and face
with his hands and at times, a flashlight.

Inmate Lopez also reported that on 9/05/01, Officer Smiley had assaulted him a
second time, this time in the facility's Admitting and Discharge Room prior to his
departure for a court appearance. Inmate Lopez wrote that both attacks on him were
unnecessary and abusive.

In his letter to Deputy Commissioner Coyle, Lopez conveyed that he remains the
subject of NCI staff harassment and abuse, claiming that his social and legal mail have
been tampered with by staff at the facility.

On 4/01/02, Director of Security Vincent Santopietro instructed this office to
investigate the aforementioned and report the findings.

1

— *Addendum VI* —

*Pls Investigate Employee conduct*
*And Report Findings*

3-7-02

Ramon Antonio Lopez  # 261685
Northern Corr. Inst.
P.o. Box 665
Somers, C.T. 06071

RECEIVED
MAR 27 2002
DEPUTY COMMISSIONER
FIELD AND SECURITY OPERATIONS

RECEIVED
MAR 21 2002
COMMISSIONER
DEPT. OF CORRECTION

Dear Executive Commisioner  Jhon Armstrong,
and deputy Commisioner's of the State of Connecticut,
department of Corrections, Deputies of operations,
Peter M. Matos, of Security Dennis Coyle,
of treatment and programs, Jack Tockarz,
My name is, Mr. Raymon Antonio Lopez
I.D. # 261685, and Im presently incarcerated at
Northern Correctional Institution a super
maximum security facilaty, in custody and care
of you and your agents.
I respectfully write you in good faith on the nature of
this Greivance and or complaint, in reguards to
cruel employee conduct of your agents.
Im asking that you and your deputies and internal
affairs division come and visit me with a video
recorder camera, to record the meeting, the nature
of my greivance, is that I was subjected retaliation,
and brutality, as well as being assaulted by correctiona
ficer, Smiley.

— Addendum VII —

--he said officer had or has issues with me, due to the fact that on, August 31, 2001, on third shift I was in unit 1-East cell 216, with my former cellmate; Thomas Micheal Nedweden #251292, a white male that was into white supremacy, and I being a hispenic male and am so not into that in any way.

So. the Unit manager at that time, Captain William Faneuff was in charge of said unit.

On August 31, 2001 around 3:00 or 4:00 am on third shift Correctional officer, Smiley worked on said date and time.

The said officer came to the cell door and alleged, or accused my cellmate and I, of flooding the tier.

~/o Smiley then came to the cell without any supervisory official, violating, prodocal, D.O.C. rules, and policy, and ordered my cellmate and I to "cuff up".

We did as told, and officer Smiley then ordered the officer in the control bubble to open the door. He then came in and hit my cellmate with a flashlight and taunted him, and me making several threats, and subsequently struck the right side of my face with his hand and flashlight.

He then stated to us that if we weren't sleeping when he came around again on tour that it was not ~oing to be pleasant.

while after he left he came by with lieutenant Oglesby and turned our water off, including the urinal.

We Told Lieutenant Oglesby that we wanted to be seen by medical, and told him what had happened, but to no avail was ignored.

After this every time c/o Smiley toured the unit my cell partner engaged in racial comments toward c/o Smiley.

c/o Smiley was clearly upset and said "I'll see one of you In the A and P room"

when first shift came in we reported the incident to captain William Faneuff, and the injuries sufferd, seeking remedy, and also handed the greivances personally to him.

Captain William Faneuff covered the incident up and fabricated the report or matter to make it look like my former cell partner and I were "horse playing"

Medical also covered it up.

So around five days later on September 5, 2001 a voice that Im sure was c/o Smiley came on the cell intercome, earlier then usual and ordered me to get ready "noowww"!

Shortly their after I was picked up by correctional officer Farley who escorted me from I-East 216 cell to the A and P room, fully restrained from the back with a tethear chain connected to the leg iron's.

On arrival to the A and P room I was placed in cell four.

Officer Farley told me to face the wall while kneeling on the bench.

At this point only the tethear chain and leg irons were removed.

I maintained my position which is proper procedure.

I heard another person come in but did not look back.

I then felt a huge debilatating slap to my right ear and face area.

I then found myself being chocked by c/o Smiley, as he made several comments to me, and reminded me of how he had stated to my cellpartner and I about getting us in the A and P room.

He then spitted on my face while still chocking me, All this while c/o Farley stood by and did not report it, or stop it.

I maintained my position as I was handcuffed from the back unable to defend myself.

He then smacked the back of my head forcefully, and both c/o's Smiley and Farley exited the cell.

I maintained my position until I heard the cell door close.

when this happened I proceeded to the cell door to have the handcuffs removed, as it is proper procedure.

At this point c/o Smiley was the one at the cell door to remove the handcuff's.

As I approached the cell door I saw Lieutenant Salius standing just behind c/o Smiley.

At once I informed him of what had just happened, but to no avail, he made it clear he had no concern of my issue for safety.

Officer Smiley re-entered then, after I spitted back on him.

As he re-entered I was still cuffed from the back, and as he came back towards me violently, again I was yelling for help to Lieutenant Salius for help, but was left to be viciously re-attacked by c/o Smiley, and put into a prone position while c/o Smiley repeatedly punched my head and body area, jamming his knee into my back, while jamming his fingers into my throat and neck area, unneeded force was being used sadistically, maliciously, for the purpose of causing harm, and not to restore control.

Lieutenant Salius covered up the matter, and allowed me to be beaten.

I was in a prone position with absolutely no control over anything, as other c/o's responded.

While in a prone position I could hear c/o Smiley tell the other c/o's that were using force to bend 'y legs, to re-apply the leg irons, and remove the handcuffs.

- - feel threatened for Safety and there is clearly a custody issue in play, as I have been constantly harrased, and get both direct and indirect reprisal

- - I had no control of what was being done, as I was in a prone position, and dominated by staff.

I was semi concious when I heard Lieutenant Salius order the C/O's bring me to medical and to drag me if they had to.

Medical covered it up by minimizing my injuries.

Two pictures were taken by D.o.c., of my injuries.

Then when I got to court that same day, I informed my attorney Jon L. Schoenhorn of 97 Oak St. Hartford, C.T. 06106, who took many clear photos of my injuries, and turned them over to the court, as part of the record, because I was in the middle of a trial.

During a tour I also informed Operations Major Micheal Lajoie at (NCI) who covered it up not taking any action.

I also note that Major Thomas Coates, and Christine Whidden, and Warden Larry Myers are aware of this officeers poor, and illegal conduct thats been going on, and have failed to rectify the matter and take any action allowing this criminal minded conduct to go on.

I ask that you please review the photos, review every thing personally, and order sanction and penalties, because the majors and lieutenant allowed these illegal acts to happen and covered the matter up from even you.

Majors and staff should be appointed to take their place starting with Warden Larry Myers who allows this type of misconduct to continue.

I also have problems with inmates who have threatened my life because of c/o's instigating, and making slandorous story's to inmates about me.

I ask that protective custody be granted, and that I be kept in a single cell.

I have already been requesting these things but no remedy has been granted.

I pray that this be rectified and properly acted upon. Thank you kindly for your time and cortesy.

CC: WARDEN Myers                    Respectfully Submitted,

CC: Major Lajoie                    Mr. Raymon A. Lopez

CC: Deputy Commsioners              I.D.#269885  1-East-107  N.C.I.
Coyle, Matos, Tokarz

CC: Commission on Human rights

CC: Attorney Jon L. Schoenhorn

C : Lopez files

CC: Fred Levesque



JON L. SCHOENHORN & ASSOCIATES
ATTORNEYS AT LAW
97 OAK STREET
HARTFORD, CONNECTICUT 06106-1515

John Armstrong
Commissioner - Dept. of Corrections
24 Wolcott Hill Road
Wethersfield, CT 06109

06109*1152