SC16583 MMX                    :    SUPREME COURT

ANTHONY R. MARTIN              :    STATE OF CONNECTICUT

V.                            :    IN HARTFORD

TROOPER JAMES BRADY ET AL.    :    APRIL 26, 2002


B E F O R E:


            JUSTICE DAVID M. BORDEN
            JUSTICE FLEMMING L. NORCOTT, JR.
            JUSTICE JOETTE KATZ
            JUSTICE CHRISTINE S. VERTEFEUILLE
            JUSTICE PETER T. ZARELLA


APPEARANCES:

FOR THE APPELLANT:
NORMAN PATTIS, ESQ.

FOR THE APPELLEES:
ELIOT D. PRESCOTT, ASSISTANT ATTORNEY GENERAL


                         Joy E. Franklin
                         Court Monitor


— *Addendum I* —

JUSTICE BORDEN:  Good morning.  This is the case of Martin versus Brady.

MR. PATTIS:  Good morning.

May it please the Court, my name is Norm Pattis.  I'm here on behalf of Mr. Martin.  I'd like to reserve ten minutes--or seven minutes, I should say--for rebuttal, but some substantial period.

This cases arises under Binette v. Sabo, and we think tests the proposition or raises the following question and that is:  Are governmental actors accountable for violating the rights of ordinary citizens?

We think that it was error to dismiss for a number of reasons.

First, the suit contends that the officers were acting in their individual capacity, not in their official capacity.

I should say that as our office construed this case, we construed Binette v. Sabo as opening an avenue of law that was going to parallel that which exists in federal law, interpreting the Ku Klux Clan Act at 42 USC 1983, so on that theory this was pled, contending the officers had violated his rights in their individual capacities.

Our Supreme Court has said, in Stoner versus Wisconsin--Wisconsin, I should say, Department of Agriculture--that when you sue a guy in his individual capacities, you're not evoking sovereign immunity.

I think what the Appellate Court did here was sort of

adopt a functional test and say that if a person's doing something in the course of his job, then he's doing so under the rubric of sovereign immunity.

That mistakes, I think, a specific intent-sort-of analysis for an intentional analysis, and what do I mean there?

My adversaries relied on the language in <u>Antinorella v. Rue</u> (phonetic) to suggest that the only way in which a state actor could be not immune under sovereign immunity would be if his conscious objective were to do something for his own individual gain.

That's not the law under 42 USC. All that's necessary is the acts be intentional, regardless of whether the specific intent was, in fact, to violate a person's rights.

Thus, in this case it's Mr. Martin's contention that state actors acted intentionally and violated him of his right to be free from unreasonable search and seizure under our state constitution and from his right to due process in that they made materially false allegations in a warrant application in order to obtain lawful access, or apparently lawful access, to his home and that they used unreasonable force.

Thus, what the case says, or what we thought we had pled, was Mr. Martin saying under state law, his rights had been violated. His rights had been violated under individuals acting under color of law.

4

Those individuals were acting under color of law, meaning with the apparent authority of the State, and the case then became a classic civil rights case.

It became a classic civil rights case in the sense that an ordinary citizen said, Wait, stop.  In this instance, you have used naked power and you are no longer cloaked with the authority of the State.

Another way of looking at this might be by analogy to the Ultra Vires Doctrine.

If the president of IBM, if I were to appear before him to discuss some decision that he had made and he struck me with a hammer, would he be acting ultra vires at that point or would he be cloaked with whatever immunities IBM enjoys?

Obviously, he wouldn't have them.  He would have exceeded his authority as chairperson of IBM and resorted to naked power.

The classic paradigm for a civil rights action when an ordinary citizen challenges the acts of government is, it says, At this point, you have ceased to behave as one who governs me, and you have behaved as those against whom I seek protection.

The German sociologist, Max Veber, in the Nineteenth Century distinguished between what it is that is power and what it is that is authority.

He said only the State has a monopoly on the legitimate use of force.  When individuals take matters into

their own hands, that's not the State; that's naked power.

What Mr. Martin sought to bring into court was an allegation that some discrete law enforcement officers behaved as the people from whom he would seek protection. They exceeded their lawful authority.   They were not, therefore, acting as state actors.  They were acting under color of law but abusing their authority and resorting to naked power.

Having said that, then the question becomes:  What should Mr. Martin have done in order to get into court?  Was there an exhaustion requirement?

My adversary contends that he should, first, have gone to the claims commissioner because the legislature alone may grant the power to sue, but that would invoke a paradox; that somehow we need to seek the permission of the State to penetrate sovereign immunity when the State behaves as something other than the State.

When the State behaves as a gang member, we have to ask it for permission to sue it?

Clearly, that's not consistent with anything in this State's constitutional jurisprudence, and there's no requirement, no similar requirement, under a similar regime that exists under federal law.

What am I talking about?  The federal Tort Claims Act operates in some respect by analogy to our claims commission, and it says that if you want to sue the federal government, the same principles of sovereign immunity apply.

If you want to sue the federal government, you must do so with the consent of congress, and it specifies a class of claims for which you can bring suit against the government.

1983, Section 1983 under <u>Patsy v. Regents</u>, explicitly says there's no exhaustion requirement, and there's no exhaustion requirement because we're not talking about sovereign or statutory immunity.  We're talking about individuals who have abused their authority and resorted to naked power.

In that instance, it's not a question of penetrating an immunity; it's a question of seeking justice for a constitutional tort.

The defendants and the Appellate Court then struggle with the question of whether the conduct alleged here is sufficiently egregious, and I found the decision of the Appellate Court bordering on this, stunning.

What, in our republic, makes an unjustified entry into a person's home anything other than egregious?

What, in our republic, says that when a man acting under color of law assaults you under the authority of the State but, in fact, he has no such authority, that is anything other than offensive to our core constitutional values?

I think this conduct, as pled in the complaint at this stage of the proceedings, should be deemed by this Court sufficient, as a matter of law, for the Court to proceed.

I'm not unmindful of the policy concerns that this Court has addressed and expressed in <u>Binette v. Sabo</u>, in the other cases relating to immunity, and that is obviously the government has an interest in continuing to do the people's business and in continuing to be shielded from litigation that may be frivolous, but there are other ways to protect against that danger.

Our federal constitution--or our federal courts, I should say--have provided guidance that this Court may want to adopt.

The guidance that this Court may want to adopt comes in such--

JUSTICE ZARELLA:  Excuse me.  Could we go back for a moment?

MR. PATTIS:  Yes.

JUSTICE ZARELLA:  Wasn't there an arrest warrant in this case?

MR. PATTIS:  For the second arrest, in the June arrest, yes, and then there was apparently an extradition warrant coming out of Florida, but, as pled, what the complaint says is that there was a warrantless entry into the home without justification or excuse, and that's at Paragraph 20 of the complaint, which I believe is at--well, I can't recall the pages.

JUSTICE ZARELLA:  (Unclear) 6.

MR. PATTIS:  Page 6 of the record.

For purposes of a motion to dismiss, I think that has

to be accepted as true and the inference drawn in favor of the non-moving party.

At Paragraph 20--excuse me, Justice--

JUSTICE ZARELLA: It is Paragraph 20.

MR. PATTIS:  --we say that his home was entered without a search warrant and in the absence of any facts or circumstances which would justify proceeding without one.

As the complaint proceeds, when you get to Paragraph 24 there is an affidavit supporting a warrant, but our contention there is that in order to get that warrant, materially-false allegations were sworn to.

What the defendants ask you to say here is that when a law enforcement officer lies to gain access to the sanctity of my home, to look and pry under my cupboards or under my bed and in my cupboards, he is doing the State's business?  I don't think that's the law.

It certainly isn't the law under federal law--this would have been--or supported a <u>Franks versus Delaware</u> sort of hearing, had the case proceeded.

Justice, what you can do, if you're inclined to do so in addressing the policy issues about avoiding frivolous claims against the State, is adopt the qualified immunity standard; that the United States constitution applies to cases arising under the Ku Klux Clan Act, and that's at <u>Harlow v. Fitzgerald</u>.

What the courts say there is, you know, we don't want the courts flooded with people aggrieved over garden-variety

inconveniences because living together can be hard.

We have to have rules and sometimes when the rules don't break your way, you're unhappy, but in order for a case to advance under federal law, it has to either be against clearly-established constitutional law or, in the alternative, reasonable law enforcement officers might disagree.

That addresses the same policy concerns that the Appellate Court addressed and that you've addressed with regard to potentially-frivolous litigation.

That avenue is open. There is case law that grows by the week in Connecticut from the federal courts and that is clearly established throughout the United States.

JUSTICE BORDEN:  We're not at that point in this appeal, are we, Mr. Pattis?

MR. PATTIS:  No, sir.  I was puzzled--

JUSTICE BORDEN:  I mean, we would get to that point, or the case would get to that point if you prevail on the appeal and we reject the sovereign-immunity bar.

Then, the next set of motions, pleadings, etc., would presumably raise the question of the extent to which the federal law, under the civil rights statutes, should be adopted under our Binette versus Sabo precedent.

MR. PATTIS:  Yes, sir.

I say that, not to anticipate the course that this litigation will take, but because my fear was that you may be reconsidering, by using this case as a vehicle, perhaps,

to reconsider <u>Binette v. Sabo</u>.

I simply don't know and I'm mindful of how closely this Court's decisions are watched to determine what policy, you know, issues are going to be addressed.

JUSTICE BORDEN:  Well, ordinarily, before we decide to re--"ordinarily" I say; it's underlined and italicized it in bold--before we decide to reconsider an important precedent, we alert the parties and say, Should so and so, such and such be reconsidered--

MR. PATTIS:  Fair enough.

<u>Binette v. Sabo</u> just created, it created quite a stir in our office.  We bring a lot of 1983 claims, and so we're reading the opinions and suddenly it's there, and, frankly, my first reaction is:  Why bother?

A plaintiff has just about everything he can get, you know, in 42 USC 1983.  Why create access to, yet, more litigation?  It takes long enough to get a case to trial. There are a lot of litigants out there.

As we thought about it, it looked to us, like, well, there are two classes of plaintiffs that will benefit by this:  Those for whom access to the federal court is not possible or is difficult, and, ironically enough, Mr. Martin, whose previous name was Trigona (phonetic), lives under a prohibition to bring federal writs, under the All Writs Act, so there's a class of one, someone who may want to use this.

There are other individuals who may have claims that

are only possible under the state constitution in the cases following <u>State versus Duke</u>.  What, for example, do I have in mind there?

A young man, let's say, who tonight is incarcerated. His lawyer comes to the police station:  I want to talk to him; he's denied.  Under federal law he would have no claim; he may, under state law.

So, you know, and so as we puzzled through this, we thought, Well, I wonder what's going to happen in the subsequent cases?    Will   Connecticut   adopt   the   same qualified-immunity test?  Will it require specific intent or just general intent as to the acts?

Then, along came <u>Martin v. Brady</u> and we thought, My word.  You know, we've missed the Court's signals entirely.

It looks as though the Court is prepared to say that a man, simply because he has a badge on, on the day that he knocks the teeth out of someone or breaks into someone's home, is a state actor enjoying statutory and qualified immunity.

So, you know, in our dark fantasies, we think perhaps the Court is retreating from <u>Binette v. Sabo</u>, and that may be all that it is.

JUSTICE BORDEN:  Maybe we're just trying to figure out what it means.  Maybe we're just trying to figure out what it means.

MR. PATTIS:  All right.  Well, I should probably stop reading tea leaves and just stick to the case law; I'd be a

far happier human being, Judge.

The other issue--I mean, we have one weakness in our complaint that, frankly, troubles me, and I don't want to run from it because it's as obvious to me as the fact that there are five of you sitting on the bench, and that is we don't have a paragraph pleading the mental state.

A better complaint in this case would have said that, at all times relevant to the acts described herein, the defendants were acting intentionally and were inspired by malice.

Were I to bring this writ myself, I certainly would have included that line, and that would have addressed mental-state issues.

I raise that because I think the defendants make a lot about mental state in their brief and say, Well, you know, really, what the plaintiff is trying to do is rope the State into paying, and then they cite the indemnification statute.

The uniform practice that I've seen in suing state actors is that the decision to indemnify is usually one made post-litigation by a committee when an evaluation of the person's conduct has already been made, and I think the inference in this complaint, if you're drawing them in favor of the non-moving party, is, clearly, these acts were done intentionally and with malice.

Malice, under federal law, for 42 USC 1983, doesn't mean inspired by hatred.  It simply means any inappropriate

13

motive.

So, what we have here is a case, we think, of some law enforcement officers who had a bone to pick with Mr. Martin, and they did so in the most constitutionally-offensive way.

This may not be a case about great money damages.

It may be a case simply about a matter of principle, and that principle is a simple one: We give to certain individuals in our society the power, the authority, to act in our name, and they act under rule of law, under the requirements of our state and federal constitution, and when they do so, they do our will, but when they step over the line, they break the social compact.

What we're asking this Court to do is stand by the implication of <u>Binette v. Sabo</u> and say that our state constitution, too, guarantees protection against warrantless searches and seizures.

It also guarantees protection against unreasonable force, and no one is entitled to either statutory or sovereign immunity for violating that.

JUSTICE BORDEN:  In <u>Binette versus Sabo</u> where they were municipal officers--

MR. PATTIS:  Correct.

JUSTICE BORDEN:  --were they sued in their individual or official capacities or both?

MR. PATTIS:  I've not looked at the complaint.

What I recall of the decision is that it was

individual, but I don't know the answer to that, sir.

Under federal law, it rarely makes sense to sue for a person in their official capacities because all you might be able to get is injunctive relief, and on the discrete sort of chaos that was described in <u>Binette v. Sabo</u>, you don't want to seek an injunction.    I mean, basically, you're looking for money damages.

JUSTICE BORDEN:    <u>Bivens</u> was a suit against the FBI agents in their individual capacities.

MR. PATTIS:    Correct.    Yes, sir, absolutely, and that was the point I'd forgotten to raise.

This case, frankly, <u>Martin v. Brady</u>, I think will represent, in Connecticut constitutional history, a moment similar to the <u>Bivens</u> case because prior to <u>Bivens</u> the claim was that you could only raise a civil rights case against a state actor; by analogy in this case, a municipal actor.

What our Supreme Court said is the dangers of abuse of power are such that when the federal government does it, it's just as bad or worse, I think, they may have said there.

We're urging you to apply <u>Bivens</u> to make <u>Martin v. Brady</u> stand as the <u>Bivens</u> equivalent.

There is no difference between a state trooper and, let's say, a police officer in the Town of Hamden when it's a midnight knock on the door and a person enters your home without a warrant.    Ordinary citizens in this state don't draw those distinctions when their rights are being abused.

We think that because of the mental-state requirement, because of the policy principle supported by Binette v. Sabo, it's not asking as a reach to apply a similar analysis to state employees--state troopers in this instance--under Binette v. Sabo.

We think that the Bivens decision shows just how easy that step would be to make.

If there are no questions, I'll save the remainder of my time for rebuttal.

JUSTICE BORDEN:  All right.

MR. PRESCOTT:  Good morning.

May it please the Court, Assistant Attorney General Eliot Prescott for the defendants.

It strikes me as very strange to say this out loud, but I actually agree with Attorney Pattis.

JUSTICE BORDEN:  You want to sit down?

MR. PATTIS:  Can I order the transcript?

MR. PRESCOTT:  And I say this in this respect.

I think where this case--to use one of your phrases, Justice Borden--went off the rails is the notion that a Binette versus Sabo claim is a claim against the State; it is not.

If it's built on the analog, the federal analog, of a Bivens claim, a Bivens claim can only be brought against a federal official in his individual capacity, so if Binette is simply the state law equivalent to Bivens, it can only be brought against a state or municipal official in his

individual capacity.

I cited in the supplemental authority letter to you a Second Circuit decision that holds as such.

What I really should have pointed you to is the United States Supreme Court's decision in FDIC versus Meyer, which is at 114 Supreme Court 996, and, since I'm agreeing with Attorney Pattis, I'm sure he doesn't mind me citing it at this point.

        JUSTICE BORDEN:  That's not in your brief, I take it?

        MR. PRESCOTT:  That's not in my brief, Your Honor.

        JUSTICE BORDEN:  What's the citation?

        MR. PRESCOTT:  114 Supreme Court 996.

Specifically, on page 1005 of that decision, I want to read to you briefly some of the Court's discussion:  More importantly, Meyer's proposed solution, essentially the circumvention of qualified immunity, would mean the evisceration of the Bivens remedy rather than its extension.

It must be remembered that the purpose of Bivens is to deter the officer.

Because the Bivens remedy is recoverable against individuals, it is a more effective deterrent than the federal Tort Claims Act remedy against the United States.

If we were to apply a damages action directly against federal agencies, or state officials in their official capacity, thereby permitting claimants to bypass qualified immunity, there would be no reason for aggrieved parties to bring damages actions against individual officers.

Under <u>Meyers</u> regime, the deterrent effects of the <u>Bivens</u> remedy would be lost.

And the Court goes on to conclude that you can't bring a <u>Bivens</u> claim against the federal government or federal officials in their official capacity.

JUSTICE BORDEN:  So, do you agree that, at least as pled, the language is certainly in the complaint that this is a claim against the defendants in their individual capacity?

MR. PRESCOTT:  Absolutely, Your Honor.

I think that was Attorney Pattis's firm's intention to sue these individuals in their individual capacity.

I think they did so because I think, looking at <u>Bivens</u> as the analog to a <u>Binette versus Sabo</u> claim, they knew they had to, so I certainly think that was their intention.

And in fairness to Justice Peters, in writing the Appellate Court decision she relied upon the test in <u>Spring versus Constantino</u> to decide whether or not an action brought against a state official is against the state official in their official or individual capacity.

I think part of the problem relies (sic) in the inherent--I want to search for the phrase here--the inherent difficulty of that test in leading to a conclusion other than the suit is against the government directly rather than the individual in its individual capacity.

Let me tell you what the test is in <u>Spring versus</u>

<u>Constantino</u>.   A state official has been sued.  Well, that's always going to be the case; that begs the question.

The suit concerns some manner in which that official represents the State.  Well, as Attorney Pattis points out, you're always going to plead under color of state law because you need state action, but that doesn't mean necessarily that it's against the government itself.

The State is the real party against whom relief is sought.  Well, maybe yes, maybe no.

I mean, always plaintiffs look to the State for deep pockets, but if they recognize that sovereign immunity will bar the action, then they're going to seek to sue the individual in his individual capacity, and perhaps he gets indemnified, perhaps he doesn't.

Four, the judgment, though normally against the official, will operate to control the activities of the State or subject it to liability.

Well, that again turns upon whether or not the State ends up indemnifying the officer if he (unclear) found liable, so the test isn't really very helpful.

I think what I'd like to do is walk you through what I think is the proper analytic framework for addressing these questions, and it's the framework that our office uses when we get a complaint, a cause of action filed against a state official.

Before I do that, I should point out that this case is one of a series of cases in which this Court is presently

considering, or has decided to consider, a number of very important sovereign immunity principles.

I think the difficulty for this Court is to fit all the pieces of the puzzle together, and it is a puzzle.

It's even more difficult to fit that puzzle together when you're doing it in a bunch of individual cases that involve discrete divisions or parts of the very sovereign immunity doctrines that are raised.

So I invite the Court, in deciding this case, to look at those other cases--and that's the <u>Martinez</u> case, the <u>Flanagan</u> case, the <u>Miller versus Egan</u> case that you just transferred to yourself recently, the <u>St. George versus Mack</u> case, and this case--to try and attempt to create a seamless and appropriate coming together of those pieces of the puzzle.

Let me take a minute here to try and help you do that.

When we get a complaint served on our office, the first thing we do is try to ascertain whether or not the official is being sued in his individual or official capacity.

Well, how do we do that?

Well, we look to the language of the complaint itself. In this case, Mr. Pattis's firm said, We're suing the officer in his individual capacity. I think that's important.

The reason why we ask this question is because