20

immediately our office has to decide who's going to represent the state official.

If he's being sued in his official capacity, there's no question that we represent him, as the attorney general is the chief civil law enforcement officer of the state.

If he's being sued in his individual capacity and we believe that his conduct was not wanton, reckless or malicious or outside the scope of his employment, we give him an option.

We say, Our office will represent you or you can retain your own lawyer. We may or may not reimburse you for that lawyer at the end of the case. We may or may not indemnify you, but that's your option.

We also ask this question of whether or not the officer's being sued in his official or individual capacity to start to address the sovereign immunity questions.

If the officer is being sued in his official capacity, what we first look is whether or not--and we're in court--we look to whether or not there's some valid legislative waiver of the Doctrine of Sovereign Immunity.

You know, is this a 31-51q action where the legislature's, you know, explicitly waived the state sovereign immunity?

If not, if we can't find such a waiver, then we know we have a motion to dismiss because the claim should be brought at the Claims Commission.

We also ask whether or not the official has been sued

in his official or individual capacity because if it's in his individual capacity and we are representing him, there are issues of personal immunity under 4-165.

Really, Mr. Pattis's discussion of qualified immunity under a <u>Binette versus Sabo</u> claim, I think, misses the point.

We have qualified immunity, or a version of it, under 4-165. That is our qualified immunity.

4-165 says the state official, being sued in his individual capacity, has immunity, complete immunity if his conduct is found not to be reckless, wanton or malicious or outside the scope of his employment.

In those cases, the claim can be brought against the State at the Claims Commission under the terms of the statute, but it cannot be brought against the official in either his official or individual capacity in Superior Court. It's a personal immunity question.

Therefore, you can see that the distinction between individual capacity claims and official capacity claims is important for a number of different reasons.

Now, here, and I should note there's one other, kind of, major exception and that is--or another part of the analysis that we look at--which is--

JUSTICE BORDEN:  Well, have you--by agreeing that this is a suit against the defendants in their individual capacity, are you conceding that the Doctrine of Sovereign Immunity does not bar this suit?

MR. PRESCOTT:  It's not implicated by this action, Your Honor.

JUSTICE BORDEN:  It's not.

MR. PRESCOTT:  It is not.

JUSTICE BORDEN:  So then, we are now--basically, we are at the point of presumptively reversing the Appellate Court and we're at your alternate ground for affirmance, which is 4-165.

MR. PRESCOTT:  That's exactly right, Your Honor, and, you know, I have to say that, to the extent that my brief suggests otherwise, I can only quote you, Justice Borden, in a case called Chung versus Commissioner of Corrections when you said:  I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion.

JUSTICE BORDEN:  I was quoting Justice Jackson who was quoting an English lord, but it's an apt quote, Mr. Prescott.

JUSTICE KATZ:  We remind him of it often.

JUSTICE BORDEN:  All the time.

MR. PRESCOTT:  So, I think the task for this Court at this point, Your Honor, is to decide whether or not, given that this is an individual-capacity claim, that they have sufficiently alleged enough facts to get around the bar of 4-165, which is not a sovereign immunity issue, it's a personal immunity issue.

Well, let's look at the complaint.

JUSTICE BORDEN:    Let    me    just    raise    one    other
question, Mr. Prescott.

MR. PRESCOTT:  Yes, Your Honor.

JUSTICE BORDEN:  Was the 4-165 ground ever raised,
either in the Trial Court or in the Appellate Court, as an
additional ground for dismissing the complaint?

MR. PRESCOTT:    Mr. Pattis can correct me if I'm
wrong, but I believe it has not been explicitly raised as
such because the courts, the Trial Court and the Appellate
Court, have been treating this case as an official-capacity
claim.

JUSTICE BORDEN:  All right.

If that's the case, then it seems to me we--first of
all, ordinarily, alternate grounds for affirmance are
grounds--there may be exceptions to this--you co-wrote the
book on appellate procedure--but, ordinarily, alternate
grounds for affirmance are grounds that were raised or
presented to the court that we're reviewing.

JUSTICE ZARELLA:  I think it was in this case.

If you turn at page 10 of the record in the motion to
dismiss, B is 4-165.

MR. PRESCOTT:  I think that's right, Your Honor.

What I was saying was I don't think the Trial Court
or the Appellate Court decided it on that ground.

JUSTICE BORDEN:  Oh, no, but it was presented.

JUSTICE ZARELLA:  But it was raised.

MR. PRESCOTT:  Yes.

JUSTICE BORDEN:    I mean, they wouldn't have had to have because once they decided that it was barred by sovereign immunity, they wouldn't have to go on and say, And it's also barred because it didn't meet 4-165.

MR. PRESCOTT:    Correct.

JUSTICE BORDEN:    Okay.

MR. PRESCOTT:    But, Your Honor, I also don't think it needs to be raised by an alternate grounds for affirmance because I think this Court often reverses the Appellate Court, or affirms them, which I asked the Court to do in this case, for reasons other than the analysis they relied on.

JUSTICE KATZ:    Can I interrupt you?

If you look on page 21, the Trial Court--page 21 of the record, and it's the Trial Court's memorandum of decision on the motion to dismiss:    In the posture of this case--now I realize this is quoting Antinorella--and then--

JUSTICE BORDEN:    No, it says it--

JUSTICE KATZ:    --in doing so, the Court finds that Martin does not allege any facts that support a claim that the defendant state officers were acting in excess of their statutory authority or that the defendant state officers' conduct come within the provisions of 4-165.

MR. PRESCOTT:    Well, that's right, Your Honor, but that gets so caught up in the Antinorella versus Reo (phonetic) analysis, which is really a separate analysis.

However we got--

JUSTICE BORDEN:  Let me just ask one more question because I don't know the answer to this, procedurally.

Is the failure to allege sufficient facts under 4-165 a ground for a motion to dismiss or a ground for a motion to strike because the answer to that question has an awful lot of meaning to Mr. Pattis because if it's a motion to strike, then if that had been the ground on which the--it was a kind of a insufficiency of allegations and that's a ground for a motion to strike.

If that were the basis, he could have had 15 days to plead over, whereas if it's a motion to dismiss, you're either in or out.

What is the answer to that question (unclear), procedurally?

MR. PRESCOTT:  It's a motion to dismiss, Your Honor, and let me explain why.

If you attempt to sue a state officer in his official capacity and you fail to allege sufficient facts to get around 4-165, it doesn't mean you don't have a claim.

It's just that your failure to make out an individual-capacity claim then becomes--I'll use the term my son uses--"morphs" into a claim against the state for which you can bring at the Claims Commission, and 4-165 says that.

So, it does implicate the issue of sovereign immunity to the extent that if--

JUSTICE BORDEN:  Because it, basically, "morphs" into a motion to dismiss because 4-165 provides the

administrative procedure of a Claims Commission proceeding, and failure to exhaust that administrative proceeding deprives the Court of subject matter jurisdiction. Is that the way it goes?

MR. PRESCOTT: Correct, correct.

So, let's look at the allegations of the complaint for a minute. What does he allege?

Well, the first thing he alleges is that they went into his home without a search warrant; that's the first claim.

But Mr. Pattis, in the Appellate Court--and Justice Peters cites his admission, his concession--says that, well, yeah, he didn't have a search warrant but there was an extradition warrant, and he's never challenged the legality or the sufficiency of that extradition warrant, so that can't be a claim of wanton, reckless or malicious conduct.

Okay. What's the next claim?

He says they entered his home again, this time with an invalid search warrant.

Well, that doesn't get him home because you could have an invalid search warrant that you got in good faith, that you think is valid. At best, that's a negligence claim.

What's the third claim?

The third claim is that when they entered the home, he was pushed to the floor and some of his personal property was damaged.

Well, that's not necessarily wanton, reckless or malicious. Police officers often have to use force in executing an arrest warrant. They often have to break down the doors.

You've got to allege more than that, and I think Mr. Pattis--I mean, fairly to him, he confronts the problem with his own complaint head on, but it doesn't allege more than that.

It doesn't allege that they did this, you know, they didn't kick him in the head eight times. It doesn't allege that he had five ribs broken. It doesn't allege the police officer's mental state. All it says is, I was pushed to the floor and some of my property was damaged.

Well, I cite cases in my brief where the United States Supreme Court has said that that's not necessarily reckless or egregious-type conduct.

So, I think this complaint falls far short of getting around the immunity provided by 4-165, and I think that, even if it was a closer call, which I don't think it is, I think you've got to plead those facts with some more particularity, particularly where the Doctrine of Sovereign Immunity is involved.

I mean, we've got to have a way of knowing where these cases belong; whether they belong at the Claims Commission--

JUSTICE BORDEN: Well, I don't understand. I'm not sure I understand your reference, "where sovereign immunity

is involved".

I mean, I know the rule is that waiver of sovereign immunity is to be strictly construed and that, you know, the statutes have to be looked at very carefully to make sure that they do actually waive sovereign immunity. We're not at the point--we've already passed the point of sovereign immunity.

I don't know of any rule that says that facts--maybe there are cases that say facts, in order to bring you within 4-165, have to be alleged with particularity but it's not because sovereign immunity is involved. You've already established that sovereign immunity is not involved.

MR. PRESCOTT: What I mean is it is in a sense, Your Honor.

For us to know where these claims, these causes of actions, these complaints go, we need to know whether or not they want to be in court or they should be going to the Claims Commission.

JUSTICE BORDEN: Oh, well, that, yes, I mean, when you say for you to know, you and the AG's office.

I mean, I'm sure you'd like us to have that, but we don't usually decide cases on particularity of pleading in order to satisfy the needs of the AG's office--

MR. PRESCOTT: Well, no, no, I real--

JUSTICE BORDEN: --or any other office.

MR. PRESCOTT: --no, I realize that, Your Honor.

What I'm suggesting is, I think, to give guidance to

both trial courts and the Claims Commission as to what cases fall, that it would be helpful that there be a requirement that these things be pled more clearly.

Use the magic words and support and allege facts that give rise to an inference that you've met.

JUSTICE BORDEN:    I guess the question is, from a pleading standpoint because usually both in motions to dismiss and motions to strike, we take pleadings in favor of the pleader and it's not just what the pleader pleads but the facts fairly provable thereunder.

Now, that "fairly provable thereunder" is, it seems to me, the elasticity, but how far the rubber band stretches, I don't know.

I guess we have said that when you mean malice and you mean beyond the scope of your employment, etc., like that, you have to say so, and that's not the kind of thing that's, kind of, implied from just general allegations of wrongdoing.

MR. PRESCOTT:    Well, that's right, Your Honor, because then in every case in which you allege wrongdoing, you would have alleged sufficient facts to get you into court, and that's not the rule.

That's not what you said in <u>Shay versus Rossi</u> where you said the allegations---you found them in that case--but you said it has to be more than gross negligence.  It has to be reckless conduct, and, boy, you can't get it from this complaint.

30

MR. PATTIS:  Let me begin where my adversary left off.

I think you do get it from this complaint, and that is the inference of malice.

Just to be clear, I'm going to concede that, Justice Borden, this case does not pass the magic-words test.

There is no paragraph that says intentional and inspired by malice, and that is a problem that we'll have to deal with.

I would have much preferred a motion to strike and the opportunity to plead over because it's easily correctable, but if--

JUSTICE BORDEN:  Where are the allegations from which we can imply malice?

MR. PATTIS:  Take a look, sir, at Paragraph 24, in particular, Sub Items 3 and 4.

JUSTICE BORDEN:  Four--

MR. PATTIS:  And this is on page 7 of the record, sir, midway down the page.

I listened with interest to the State's contention that all we had pled was garden-variety negligence.

I do agree with the State that, insofar as federal law is concerned, negligence is never enough to raise a claim of official misconduct.

Subparagraph 3 says:  Brady (unclear) a claim defendant and it was claimed that he spoke with Martin on one occasion, and Martin refused to come to the door.

31

Martin never refused to come to any door.  There's a stark dispute of fact there, where the--

JUSTICE BORDEN:  Well, I suggest to you, Mr. Pattis, that these kinds of allegations--these allegations of falsity wouldn't even get you, in the criminal case, a <u>Franks</u> hearing because you have to--just because they made false statements doesn't imply that they intentionally or maliciously or knowingly made the false statements; in other words, that they knew that they were false when they made them.

That's--I mean, we have lots of cases under <u>Franks</u> that say that, I know sometimes judges grant the hearings when, you know, just someone files a motion and says the affidavit is false and I grant a hearing, but if you look at <u>Franks</u> and the cases under it, that's not the standard.

You've got to go pretty far before you get a <u>Franks</u> hearing.  This wouldn't--I don't think, properly understood, these allegations would get you a <u>Franks</u> hearing.

Why is it necessarily or inferentially malicious here?

MR. PATTIS:  That's two questions, but as to the <u>Franks</u> question, you know, the <u>Franks</u> analysis requires a four-corners analysis and then you have to make a showing of materiality and so forth, and I'll concede that those words aren't in this complaint, either.

But to address the question of malice, if an officer looks--if I were to leave this courtroom today and say the

justices wore pink robes--I was there, I saw it--I'm either mistaken or I'm lying but I'm not negligent.

I think in this case what we're saying is that the officers made misrepresentations of fact which, at this stage of the pleading, were material.

Look at Paragraph 4, the one that immediately follows; there's more bite to it.

Mr. Martin was accused, in fact, of attempting to hide himself or to frustrate the defendants, and Mr. Martin denies that. Mr. Martin, in fact, made no attempt to conceal himself or to frustrate the defendants.

So, what the contention here is, is that the officers wrote a warrant, and they jazzed it up dramatically, perhaps, for purposes of persuading a reviewing magistrate to sign it, and that's, sort of, the classic, sort of, Franks analysis.

This complaint was not drafted to meet the requirements of Frank v. Delaware; I'm not sure that it had to.

It was meant to put the State on notice that this is the direction in which we're heading, and my sense is that, in terms of the sort of analysis needed to evaluate a Franks claim--that is, whether a person makes--

JUSTICE BORDEN:  I didn't mean to suggest that the Franks claim controls the pleading, but it seems to me that Mr. Prescott has a point that, under the 4-165 analysis that he presents and what it takes to either be within or without

the 4-165, that if you're within 4-165, I guess if you're
outside of 4-175--I'm trying to figure out the way it works-
-but in any event, under his analysis of 4-165, this seems
to fall short.

MR. PATTIS: I'm not sure I agree with that, and even
if that's true, I think we should have been given the
opportunity to plead over, rather than being bound to this
version of events and then claim it's jurisdictional because
I was puzzled by this--

JUSTICE BORDEN: Well, you had Record 10 or whatever,
yes, Record 10 says it was a motion to dismiss, and
Paragraph B says is barred and plaintiff failed to exhaust
his administrative remedies.

I mean, these are all subject-matter-jurisdictional
things. You could have--

MR. PATTIS: Let me address that.

JUSTICE BORDEN: --you could have pleaded over then,
I suppose.

MR. PATTIS: We don't believe that in raising a claim
under Binette v. Sabo, there is an administrative bar or
barrier to going to court.

Patsy versus the Board of Regents--I double checked
both of our briefs. Unfortunately, neither of us recited
that case, but P-A-T-S-Y versus Board of Regents is the
federal case that says that under 1983, at least, there is
no exhaustion requirement.

I think that, given the author of this complaint's

intention, he signals to the reviewing authority, Look, we're suing an individual capacity. There is no way, under the law's green earth--

JUSTICE BORDEN:  Do you have the citation for Patsy?

MR. PATTIS:  No, but I will provide it by way of letter, with the Court's permission?

JUSTICE BORDEN:  Okay.

MR. PATTIS:  There is no conceivable set of facts under which this complaint could ever "morph", to use my adversary's child's expression, into a complaint against the State.  There is not a federal equivalent to the case of Monell versus Social Services.

That's where you claim that there--in the municipal context under 1983, there's a policy practice pattern, custom, or state of events endorsed by a policy maker that, in effect, says we're going to do something unlawful.  We're not going to provide people bond, let's say.

JUSTICE BORDEN:  But one of the underpinnings of Binette v. Sabo--and I think also under Bivens versus Bivens--is the unavailability of some other remedy.

Now, if there is, and this seems to be the avenue down which Mr. Prescott's analysis is traveling, if there is another remedy by which the plaintiff can get the same kind of relief, i.e. money damages, and it is a 4-165 claim, or it is a claim against a claims commissioner under 4-165--a claim presented to the claims commissioner--and we have said, at least in other contexts, that there's nothing

35

inadequate about having to present claims to a claims commissioner, why doesn't that undercut--I don't know what <u>Patsy</u> says about that, but is <u>Patsy</u> a <u>Bivens</u>-type claim?

MR. PATTIS:  It interprets 42 USC 1983, here's the answer because--

JUSTICE BORDEN:  Yes, but that's different, that's different.  I mean, every 1983 action is not a <u>Bivens</u>-type claim, nor is it--

MR. PATTIS:  Well, see, my view of <u>Bivens</u> is it was really a question about jurisdiction, about subject matter jurisdiction, and once it opened the door, it said, okay, you've got, you know, jurisdiction as to Classes A, B, and C; what about D?

Well, okay, you have jurisdiction as to D; therefore, these collateral rules already applied to A through C now apply to D.  I may be wrong but that's how I read that case.

Now, nowhere in the 1983 context do people bring claims under the Federal Tort Claims Act for the more than negligent constitutional torts, and the government does not assume responsibility for them.

My contention is that on the facts of this case, there is no other remedy because if the tortfeasor behaved with the requisite mental state to deprive him of personal immunity, the State's then going to elect whether or not to indemnify, but that's an election that they may or may not make.

The State's not going to come in and say, You've

36

wantonly and maliciously trashed my home without a warrant and without sufficient justification or excuse, but we'll pay.

That's simply not happening. I can think of no case in which it has, and, again, there is, you know, now we get to a very fascinating piece of constitutional doctrine.

We're not suggesting to return to sovereign immunity, that there ought to be a Monell claim as against the state. I'm not aware of any claim that there would be.

We say that there is no other remedy for malicious constitutional torts than going after the individual in his individual capacity.

If we took the claim to the Claims Commission on a mere negligence claim, he would say, No, you don't make it, and the State would not stand in to take it.

So, frankly, Justice, this is the only remedy a person will have here, and, in my view, that's the significance of Binette v. Sabo.

What it's done is it's said prior to this, a state actor who acted with the requisite mental state was not personally liable; neither was the State.

Now we're going to make people accountable. The State will decide whether to indemnify. Those are policy decisions that the attorney general, as a constitutional officer, makes for whatever reasons, and--

JUSTICE BORDEN: I should say your time has about expired, Mr. Pattis.

MR. PATTIS: I'm sorry. I get going on these and I never know when to stop. I apologize. This is an interesting area of the law.

JUSTICE BORDEN: You don't have to apologize.

You can take a minute to sum up or if someone has a question.

JUSTICE ZARELLA: Before you move on, Counsel, page 6 of the record, Paragraph 20.

MR. PATTIS: Paragraph which, sir?

JUSTICE ZARELLA: Twenty.

MR. PATTIS: Yes, sir.

JUSTICE ZARELLA: The last sentence.

MR. PATTIS: Um-hum.

JUSTICE ZARELLA: How would you read that in order to help your claim here, factual claim?

MR. PATTIS: In order to help my claim, I would say that when he was submitted to arrest, whereupon he was struck and thrown to the floor, that that was without justification or excuse.

JUSTICE ZARELLA: So the submission occurred and then he was struck and thrown to the floor?

MR. PATTIS: Correct, correct.

We acknowledge that force is sometimes necessary in an arrest, and so does the United States Supreme Court.

The United States Supreme Court, however, has never said that gratuitous acts of violence are justifiable.

JUSTICE ZARELLA: When they entered, you indicate

38

that they entered without a search warrant.  Did they have an arrest warrant?

MR. PATTIS:  I believe they did, sir, and this was an awkward moment at the Appellate Court and it's just as awkward here.

Taking this as pled, I mean, I think that we're entitled to the inference.  That's an issue that should be addressed at summary judgment.

If there are no other questions, thank you very much.

JUSTICE BORDEN:  Thank you.

(The hearing is ended.)

SC16583 MMX

ANTHONY R. MARTIN

V.

TROOPER JAMES BRADY ET AL.


C E R T I F I C A T I O N


I, Joy E. Franklin, do hereby certify that the foregoing pages are a true and accurate transcription of the tape in the above-entitled matter heard in the Supreme Court by Justice David M. Borden, Justice Flemming L. Norcott, Jr., Justice Joette Katz, Justice Christine S. Vertefeuille and Justice Peter T. Zarella on April 26, 2002, in Hartford, Connecticut.

Dated this 31st day of October, 2004, in Hartford, Connecticut.

Joy E. Franklin
Court Monitor